Elijah COLEMAN, Appellant,

v.

STATE of Alaska, Appellee.

No. 4416.

Supreme Court of Alaska.

Oct. 10, 1980.

Michael T. Thomas and Pamela Finley, Juneau, for appellant.

James L. Hanley, Asst. Dist. Atty., Patrick J. Gullufsen, Dist. Atty., and Avrum M. Gross, Atty. Gen., Juneau, for appellee.

Before RABINOWITZ, C. J., and CONNOR, BOOCHEVER, BURKE and MATTHEWS, JJ.*

* This case was submitted to the court for decision prior to Justice Boochever's resignation.

## OPINION

RABINOWITZ, Chief Justice.

Elijah Coleman was convicted of one count of rape under former AS 11.15.120 [1] and one count of assault with a dangerous weapon under former AS 11.15.220.[2] Coleman argues on appeal that evidence of a prior rape conviction was improperly allowed into evidence, that the jury was given an erroneous instruction on the elements of assault with a dangerous weapon, that he was deprived of effective assistance of counsel and that his sentence was excessive. We affirm both convictions as well as the sentences which were imposed.

The victim of the crimes in question, B.E., testified that on April 5, 1978, she left her house in Juneau at 4:40 in the afternoon to go jogging. As she came around a sharp corner on a narrow, uninhabited dirt road near her house, she noticed a red pickup truck, with a chrome-rimmed spare tire mounted on its side, parked along the edge of the road. After going about fifty feet beyond this truck, she heard the sound of running footsteps overtaking her. Then the arm of a black man suddenly circled her throat and she was forcibly choked, lifted, and propelled into the woods alongside the road. There her assailant put her on the ground, held a hand to her throat, and pulled down the levi pants she was wearing, breaking the zipper in the process. The man attempted vaginal intercourse, then forced B.E. to engage in oral intercourse.

B.E. was then allowed to stand and pull up her clothing. But as she started to leave, the man grabbed her arm, saying he was not through with her and that he did not want her to tell anyone. At this point he picked up a fist-sized rock, forced B.E. to lie down once more, straddled her, and while holding the rock pushed her head to one side, causing B.E. to believe that the man was positioning her head in order to hit her with the rock. B.E. testified, however, that the assailant never raised the rock over his head or made any gesture which caused her to flinch or duck. According to B.E., a long period of discussion and prayer with the man then ensued, during which she promised she would not tell anyone of the event. The assailant promised he would not do such a thing again, and allowed her to leave.

As she walked back toward her house, her hands in the pockets of her sweatshirt in order to pull it over the broken zipper of her pants, B.E. met a neighbor. B.E. did not tell the neighbor about the incident, but the neighbor later testified to observing a red truck in the location described by B.E., which backed up as soon as the neighbor saw it. The neighbor also thought it strange that B.E. had her hands in the pockets of her sweatshirt jacket when she met her, due to the warmth of the day and the heat generated by jogging.

B.E. did tell a friend that evening what had happened, and the next morning contacted the Juneau Women Against Assault Group, upon whose advice she typed a two-page document detailing all she could remember of the event, including a description of the assailant, his clothing, and a watch he wore. She contacted the Alaska State Troopers two days after the incident and gave a lengthy statement. Upon being presented with a photographic lineup of nine black men, she immediately identified a photograph of Elijah Coleman as the assailant. The next day, while driving past a local eating establishment with her hus-

---

1. At the time of the offense, AS 11.15.120(a) provided:

 Sec. 11.15.120. Rape. (a) A person who (1) has carnal knowledge of another person, forcibly and against the will of the other person, or (2) being 16 years of age or older, carnally knows and abuses a person under 16 years of age, is guilty of rape. [Ch. 185, § 1, SLA 1976; repealed by ch. 166, § 21, SLA 1978, eff. January 1, 1980.]

2. At the time of the offense, AS 11.15.220 provided:

 Sec. 11.15.220. Assault with dangerous weapon. A person armed with a dangerous weapon, who assaults another with the weapon, is punishable by imprisonment for not more than 10 years nor less than six months, or by a fine of not more than $1,000 nor less than $100, or by both. [Ch. 139, § 2, SLA 1976; repealed by ch. 166, § 21, SLA 1978, eff. January 1, 1980.]

band, B.E. identified an unoccupied truck as the one parked on the dirt road at the time of the attack, and reported the license number to the police.

The police investigator ascertained that the vehicle was registered to Coleman, and upon obtaining an arrest and search warrant went to Coleman's apartment. There a jacket and pair of running shoes matching the detailed description provided in the statement typed by B.E. were found.

The time of the rape was determined from B.E.'s account to be approximately 5:00 p. m. After his arrest, Coleman was questioned and claimed to be at the Auke Bay Campus of the University of Alaska shortly before 5:00 p. m. preparing for a 6:00 p. m. class. Coleman was unable to suggest anyone who could verify his presence there at that time, though. The police later determined that it takes about six and one-half minutes to drive from the location of the rape to the Auke Bay Campus.

An investigator arranged a lineup in which B.E. positively identified Coleman as the man who raped her. The clothing the victim had worn during the incident, the clothing taken from Coleman's apartment, and lichen plant material taken from the site of the rape were sent to the FBI laboratory. There fibers similar to those from B.E.'s sweatshirt were found on Coleman's jacket, lichen material similar to that from the site of the rape was found on B.E.'s sweatshirt, and a semen-like chemical was found on the inside of the crotch area of B.E.'s pants, which she testified she only used for jogging. None of this evidence was rebutted at trial.

I. Evidence of prior crimes.

■ Coleman first asserts on appeal that the superior court erred in permitting the state to introduce testimony by a victim of a prior rape for which Coleman was convicted. Admission of evidence of prior bad acts is by its nature highly prejudicial and should always be subject to careful scrutiny.[3] Our review of the record indicates that in this instance the evidence was properly admitted.

■ The subject of prior bad acts is generally covered by Alaska Rule of Evidence 404(b), which provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

In this case evidence of the circumstances of the prior rape was properly admitted for the purpose of proving the identity of the assailant, by showing a distinctive *modus operandi* employed in both the prior rape of which Coleman was convicted and the rape of B.E.[4] Coleman argues that identity was not in issue, because his defense attorney in opening argument conceded that Coleman met with B.E. at the time in question. However, the state, in addition to the testimony of B.E. and her neighbor tending to establish that Coleman was the person who committed the rape, presented testimony that Coleman had denied being at the location of the crime or knowing B.E. This evidence remained undisputed by contrary evidence up to the time the case was submitted to the jury for deliberation. Further, defense counsel had the opportunity to stipulate that identity was not in issue at

3. *See* E. Cleary, McCormick on Evidence § 190, at 447 (2d ed. 1972).

4. *See People v. Sam*, 71 Cal.2d 194, 454 P.2d 700, 705, 77 Cal.Rptr. 804 (1969) (citations omitted), in which the court stated:

*Modus operandi* is generally a means of proving the identity of the perpetrator of the crime charged, by demonstrating that the defendant had committed in the past other crimes sharing with the present offense features sufficiently unique to make it likely that the same person committed the several crimes.

*See also Nester v. State*, 75 Nev. 41, 334 P.2d 524, 527 (1959); E. Cleary, McCormick on Evidence § 190 at 451 (2d ed. 1972); R. Lempert and S. Saltzburg, A Modern Approach to Evidence 218–19 (1977).

several times prior to the time the testimony of the prior rape victim was introduced, but failed to do so.[5] In these circumstances, defense counsel's remarks in opening argument did not provide sufficient assurance to the state that Coleman would not at some subsequent point during the trial dispute his presence at the scene of the crime, unlike other cases involving evidence of prior crimes where identity clearly was not in issue.[6]

It is also our opinion that the evidence in question showed that the prior rape and the rape of B.E. were sufficiently similar and unusual in their common pattern to constitute a *modus operandi* probative of Coleman being the assailant in both instances. The testimony showed the two crimes shared common elements in the race and age of the victims, the situs chosen for the attack, the manner of subduing the victim, the type of intercourse which occurred, and the behavior of the assailant following the attack. Both victims were relatively young caucasian women, and were on foot near a wooded area when attacked. Each indi-

cated that the first awareness of the assailant's presence was the sound of running footsteps behind her, and that the first realization that she was being assaulted was when the attacker placed his arm around her throat, choking her. In both instances, the attacker rapidly propelled the victim from behind, with his arm still around her throat, into the woods. In both instances oral intercourse was performed as well as an effort at vaginal intercourse (the prior rape also involved anal intercourse). Following both attacks the assailant discussed whether the victim would report him to the police, and allowed the victim to walk away. These characteristics are not so unique as to constitute a "signature crime," as one commentator suggests should be required to prove like identity,[7] nor is each of the above common features material standing alone. But a review of cases in this and other jurisdictions indicate that the similarities in the attacks, taken together, compare favorably with other instances where evidence of prior rapes has been held properly admitted for the purpose of proving identity.[8]

---

5. At the omnibus hearing the state initially gave verbal notice that it intended to present the testimony of two prior victims of rape by Coleman. At a later hearing, the court ordered the state to file a written memorandum of what evidence it planned to present and for what purposes. The memorandum filed in response stated "identity and prior *modus operandi*" as reasons for introducing the proposed testimony. Coleman filed no response to this memorandum, and the court ruled that the testimony would be admitted for the limited purposes offered. Subsequently, one of the rape victims became unavailable to testify. After the remaining prior rape victim was called to the stand, defense counsel objected and the admissibility of the evidence was again argued. Despite the state's assertion that identity was still in issue and the court's explicit finding on this point, defense counsel did not stipulate to the fact of Coleman's meeting with B.E.

6. *See People v. Guerrero*, 16 Cal.3d 719, 548 P.2d 366, 369, 129 Cal.Rptr. 166 (1976) ("defendant's presence at the scene of the crime was well established by other evidence"); *People v. Sam*, 71 Cal.2d 194, 454 P.2d 700, 702–03, 705, 77 Cal.Rptr. 804 (1969) (defendant's own statement admitted to the event); *Founts v. State*, 483 P.2d 654, 655–56 (Nev.1971) ("Founts was identified as the robber by the three barbers who were in the shop at the time of the robbery"); *Roulston v. State*, 307 P.2d

861, 872 (Okl.Cr.1957) ("Testimony reflects in the case at bar that positive identification was made of the defendant by the victim. He was apprehended in the car bearing the license number of the one used in robbing the victim. When he was apprehended the money in its original box with the victim's name on it was found in the car."); *Redd v. State*, 522 S.W.2d 890, 892–93 (Tex.Cr.App.1975) (four unimpeached identifying witnesses).

7. E. Cleary, McCormick on Evidence § 190 at 499 (2d ed. 1972). *But see* R. Lempert and S. Saltzburg, A Modern Approach to Evidence 218 n.76 (1977) regarding the split of authority over what constitutes a "signature" crime: "[S]ome courts see writing where others would see blank walls."

8. In *Stevens v. State*, 582 P.2d 621, 629 (Alaska 1978), we concluded that the trial court had not abused its discretion in denying a severance for trial motion pertaining to two alleged rapes which had occurred 19 days apart, and indicated that if the counts had been tried separately, the facts pertaining to the count not charged could have been properly introduced for the purpose of showing the common identity of the attacker. The pattern shared between the two crimes was described as follows:

Both victims were young native women. Both events occurred during the daytime

To be properly admissible, the probative value of evidence of prior crimes cannot be outweighed by its prejudicial effect in illustrating bad character or propensity towards criminal conduct on the part of the accused.[9] In this regard, we note that the trial judge indicated his awareness of this requirement by carefully taking steps to ensure that the testimony regarding the prior rape was properly limited in its presentation before the jury, in order to minimize its prejudicial effect. Prior to trial, written notice of the content of the evidence and the purpose for which it would be introduced was requested and ruled upon. At trial, the judge admonished the jury as to the limited purpose of the evidence immediately prior to its presentation and also gave a written cautionary instruction as to its limited use. The testimony itself was strictly limited to establishing the fact that Coleman had committed a prior offense with characteristics similar to the rape of B.E. Given these precautions and the substantial probative value of this evidence discussed above, we cannot conclude that the superior court abused its discretion in admitting the questioned testimony.[10]

## II. Jury instructions on the law of assault with a dangerous weapon.

Coleman objected to the following instruction which was submitted to the jury:

A person commits the crime of assault with a dangerous weapon who engages in conduct with a dangerous weapon which places another person in reasonable apprehension of receiving bodily harm.

Coleman argues that this instruction is an incorrect statement of the law in this jurisdiction, in that it omits the requirement that some physical gesture of force or an actual attempted battery occur to constitute assault with a deadly weapon under AS 11.15.220.

We disagree. The elements of assault with a deadly weapon were not defined in AS 11.15.220 or any other statute in effect in Alaska at the time Coleman's crime allegedly occurred.[11] However, a review of Alaska case law shows that the above instruction adequately delineates the essential elements of the offense. It is true that in this jurisdiction some physical gesture of force reflecting an immediate ability to inflict injury is required to constitute an assault.[12] However, any "conduct" with

---

hours between 9:00 and 12:30 p.m. Both testified they were walking when Stevens picked them up. Both were threatened with a folding knife. Both described the car that Stevens was driving as being brown on the bottom and white on top. Both women were forced to engage in oral intercourse, prior to the actual rape. Both were forced to assume a position in the front seat whereby their heads were pointed toward the passenger door and both were entered from behind. The rapes occurred less than three weeks apart....
582 P.2d at 629 n.32 (citations and footnotes omitted). In contrast to *Stevens*, the prior rape for which Coleman was convicted occurred five years prior to the rape of B.E. However, B.E. was raped less than two months after Coleman was released from incarceration for his first rape conviction.
*See also, State v. Thomas*, 110 Ariz. 106, 515 P.2d 851, 853 (1973); *Nester v. State*, 75 Nev. 41, 334 P.2d 524, 527–31 (1959); *State v. Sterling*, 15 Or.App. 425, 516 P.2d 87, 87–88 (1973). California requires that prior sex offenses be not too remote in time, be similar to the offense charged, and be committed upon persons similar to the prosecuting witness. *People v.*

*Thomas*, 20 Cal.3d 457, 573 P.2d 433, 437, 143 Cal.Rptr. 215 (1978).

9. Alaska R.Evid. 403.

10. *See McMichael v. State*, 577 P.2d 398, 401 (Nev.1978); *Nester v. State*, 75 Nev. 41, 334 P.2d 524, 531–32 (1959).

11. *See* note 2 *supra*. As part of the new criminal code for Alaska effective January 1, 1980, the offense of assault in the second degree is a class B felony authorizing imprisonment for up to 10 years [AS 11.41.210(b), 12.55.125(d)], defined to include the following:

(a) A person commits the crime of assault in the second degree if

. . . .

(2) he intentionally places another person in fear of imminent serious physical injury by means of a dangerous instrument; ...
It is also a class B felony under the new code if one attempts to cause serious physical injury with a dangerous weapon and fails. AS 11.31.-100, 11.41.200.

12. Coleman points out that the territorial assault statute, codified as AS 11.15.220, was

a dangerous weapon sufficiently threatening to create "a reasonable apprehension of receiving bodily harm" satisfies this requirement. Merely pointing a loaded, but uncocked, gun at another within range is sufficient, even if unaccompanied by threatening words. *See Jackson v. United States*, 102 F. 473, 484 (9th Cir. 1900); *Hobbs v. State*, 363 P.2d 357, 359 (Alaska 1961); *State v. Godfrey*, 20 P. 625, 627–28 (Or. 1889). Most recently, this court approved a jury instruction defining assault with a dangerous weapon to include merely threatening another person with the weapon in a menacing manner, in a case holding that an intent to cause fear was sufficient to provide the requisite *mens rea* in an assault. *Silas v. State*, 595 P.2d 651 (Alaska 1979).

■ If there was any deficiency in the questioned instruction, we believe it was harmless error.[13] Coleman's acts went beyond merely picking up a rock. He forced B.E. back to the ground, positioned her head as if to strike her with the stone as he held it in his hand, and told her he did not want her to inform anyone about the rape. This conduct is clearly within the realm of threatening physical action held to constitute assault with a dangerous weapon in the cases noted. Further, the jury was presented with other instructions which informed them that the act must be committed with the intent to use the weapon as a means of offering or attempting bodily in-

jury, coupled with the actual ability to inflict injury.

III. Denial of effective assistance of counsel.

Considerable differences arose between Coleman and his appointed public defender attorney before and during trial. Three months prior to trial, Coleman filed a *pro se* motion for appointment of private counsel in lieu of an attorney from the public defender agency, on the grounds of "disinterest", explaining particularly that he felt from his past experience with the agency that its workload made it impossible for it to properly handle his case. After personally interviewing Coleman and his counsel, the trial court concluded that the appointed public defender had sufficient time to properly handle the case and denied the motion. On the day trial was scheduled to commence, however, Coleman's attorney himself filed a motion for withdrawal and substitution of counsel, accompanied by a motion for continuance of the trial. The grounds stated were that there was a breakdown in the attorney-client relationship because Coleman was accusing the attorney of misconduct, that Coleman in effect was discharging the attorney, and that the attorney believed that to place Coleman on the stand to testify to his innocence would violate the bar disciplinary rules prohibiting counsel from knowingly using perjured testimony. This motion was also de-

adopted with the interpretation placed on it by the Oregon courts. *State v. Silas*, 595 P.2d 651, 653 (Alaska 1979); *Menard v. State*, 578 P.2d 966, 970 (Alaska 1978). In *State v. McLennen*, 16 Or. 59, 16 P. 879, 880 (1888), the Oregon supreme court defined assault as follows:

'An assault is any unlawful physical force, partly or fully put in motion, creating a reasonable apprehension of immediate physical injury to a human being; as raising a cane to strike him, pointing in a threatening manner a loaded gun at him, and the like.' Or, more tersely, an assault is thus defined by Wharton: 'An assault is an intentional attempt to do an injury to another.'
(citations omitted).

**13.** Alaska R.Crim.P. 47 provides:
 (a) *Harmless Error.* Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.

Since the error here alleged is not a constitutional error, we need not find it "harmless beyond a reasonable doubt", but rather assess it under the following less rigorous test:
 [If] one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.
*Love v. State*, 457 P.2d 622, 631 (Alaska 1969), *quoting Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557, 1566–67 (1946).

nied,[14] the superior court directing counsel to allow Coleman to testify, to question him on direct examination, and to argue Coleman's version of the facts before the jury.

Following these instructions, defense counsel in his opening statement indicated that Coleman would testify to meeting B.E. at the time of the alleged rape in order to question her about tires stolen from his truck. Counsel stated that Coleman would testify that "while living in the Bergmann [hotel]," Coleman looked out the window upon hearing a car departing with a distinctive sound, and noticed that two tires were missing from his truck, and that Coleman later saw B.E. in a car which made the same distinctive sound. Counsel then related that Coleman would testify that upon seeing B.E. once more as she was jogging at the time of the alleged rape, he stopped her to ask about the stolen tires, but left her unharmed after obtaining no information.

Coleman subsequently refused to testify on his own behalf. One month after the verdict was returned, Coleman filed *pro se* a "motion for relief from unauthorized acts of an attorney", renewing his allegations of misconduct which led to his counsel's request to withdraw from the case. This motion was accompanied by a letter to the trial judge, in which Coleman stated that one reason he had refused to testify was that the statement his attorney made in opening argument was incorrect, in that it was from Coleman's place of work that he saw that his tires were stolen, and not from the Bergmann Hotel where he lived. Because it is impossible to see the parking area from Coleman's room at the Bergmann and because the prosecuting attorney discussed this on the record with the trial judge, Coleman alleged that he had no choice but to refuse to testify. Coleman asked variously for relief from his conviction or for a new trial with new counsel. The motion was not granted.

■ On appeal, Coleman asserts that he was denied his constitutional right to effective assistance of counsel[15] on the grounds that 1) counsel was not adequately prepared at trial; 2) the attorney-client relationship had deteriorated to such an extent that his attorney could not possibly provide effective representation; and 3) his lawyer proceeded in the belief that he could not represent Coleman fully without violating his ethical obligations. We hold that Coleman was not denied effective assistance of counsel for any of these reasons.

■ In treating each of these assertions, we start from the premise that indigent defendants are not constitutionally entitled to counsel of their choice or private appointed counsel in lieu of a public defender attorney as a matter of right.[16] Therefore, the denial of Coleman's motion for private appointed counsel by the initial superior court judge in the case at bar was not error, given his examination of Coleman

---

**14.** The judge who was initially assigned the case was replaced due to ill health, thus a different judge heard the attorney's motion than the one who heard Coleman's initial motion for change of counsel.

**15.** The sixth amendment of the United States Constitution provides that an accused shall enjoy the assistance of counsel for his defense, and in *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), the United States Supreme Court held the requirement applicable to state trials by virtue of the fourteenth amendment. Article I, § 11 of the Constitution of Alaska also provides that an accused shall be "entitled ... to have the assistance of counsel for his defense." The assistance must be "effective" to satisfy the constitutional guarantee. *Risher v. State*, 523 P.2d 421, 423 (Alaska 1974).

**16.** *See McKinnon v. State*, 526 P.2d 18, 22 (Alaska 1974); *Stevens v. State*, 514 P.2d 3, 4–5 (Alaska 1973); *Knaub v. State*, 443 P.2d 44, 50 n. 15 (Alaska 1968), *cert. denied*, 393 U.S. 1039, 89 S.Ct. 661, 21 L.Ed.2d 586 (1969); *State v. Deluna*, 110 Ariz. 497, 520 P.2d 1121, 1124–25 (1974); *People v. Williams*, 174 Cal. App.2d 364, 345 P.2d 47, 55 (1959), *cert. denied*, 363 U.S. 807, 80 S.Ct. 1244, 4 L.Ed.2d 1150 (1960); *Maynes v. People*, 178 Colo. 88, 495 P.2d 551, 553 (1972); Annot., Indigent's Right to Particular Counsel, 66 A.L.R.3d 996.

Coleman has not argued for his right to represent himself in lieu of any counsel, and thus the issue presented in *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) is not presented in this case.

and his appointed public defender regarding whether the attorney could properly represent Coleman. Coleman's arguments regarding the denial of his other motions are best analyzed in terms of the standards for effective assistance of counsel delineated in *Risher v. State*, 523 P.2d 421 (Alaska 1974). In *Risher*, a two-pronged test was articulated for determining whether a defendant is entitled to a new trial on the basis of ineffective assistance of counsel. To justify a new trial, counsel's conduct either generally throughout the trial or in one or more specific instances must be found to have violated the following standard of competence:

> Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interest, undeflected by conflicting considerations.

523 P.2d at 424, *quoting Beasley v. United States*, 491 F.2d 687, 696 (6th Cir. 1974). The requirement is one of minimal competency within the wide range of reasonable performance which may be expected of a skilled attorney in the course of a trial, not a prohibition against all mistakes and errors in judgment:

> Lawyers may display a wide spectrum of ability and still have their performance fall within the range of competence displayed by one of ordinary training and

skill in the criminal law. It is only when the ability is below the nadir of that range that we would hold it to constitute a deprivation of effective assistance of counsel. We are not condoning the second-guessing of trial counsel in making the myriad decisions encountered in a criminal trial, for it is a truism that hindsight furnishes 20–20 vision. All that is required of counsel is that his decisions, when viewed in the framework of trial pressures, be within the range of reasonable actions which might have been taken by an attorney skilled in the criminal law, regardless of the outcome of such decisions.

523 P.2d at 424.

■ Once a lack of competency is shown, the defendant has the further burden of creating a "reasonable doubt" to the effect that the incompetence contributed to the outcome. 523 P.2d at 425.

■ Coleman's assertions that his counsel was inadequately prepared and his other allegations that the attorney was mishandling the case are unsubstantiated in the record.[17] Coleman now complains that an evidentiary hearing concerning the allegations should have been held, but the record shows Coleman was given at least three opportunities to detail his complaints re-

---

17. Coleman's complaints against his attorney, other than general distrust of the Public Defender Agency, included inadequate investigation of the case; failure to meet Coleman with sufficient frequency; disclosing confidences between client and attorney to other persons in an effort to persuade Coleman to plead guilty; and failing to adequately cross-examine witnesses at the trial.

Coleman's attorney submitted a statement, with his own request to withdraw, in which he denied these allegations, maintaining that he visited Coleman several times regarding the case (Coleman acknowledged at least four visits), investigated the state's evidence, interviewed the investigating officer, and met with the persons handling psychiatric examination and psychological counseling for Coleman regarding an insanity defense. The attorney initially persuaded Coleman to plead insanity, but when Coleman decided to change his plea to not guilty, counsel pursued that choice. The attorney strongly recommended that defendant

plead no contest to the rape charge in exchange for an offer by the district attorney to drop the assault charge, but followed Coleman's decision to decline that option. (Coleman contends the plea-bargain attempt was a plot, but by the district attorney, not his own counsel.)

At trial, defense counsel made an offer of proof that he had three witnesses other than Coleman ready to support the story about the theft of the tires from Coleman's truck, in the event Coleman testified. A review of the record reveals no deviation from prudent trial technique in the cross-examination of witnesses. In particular, defense counsel aggressively and effectively cross-examined the investigating officer who testified that Coleman denied being at the scene of the alleged rape, eliciting an admission that the officer never asked Coleman his exact whereabouts immediately prior to the time the rape was alleged to have occurred, opening the possibility that Coleman could have been at the scene and left just prior to when B.E. asserted the crime took place.

garding counsel before the court, and that at each of these hearings the superior court was convinced after listening to both Coleman and his attorney that substitution of counsel was not justified.[18] Because Coleman's post-trial motion and letter essentially repeated these allegations, we cannot conclude that the superior court's failure to order an evidentiary hearing at that point was in error.

Focussing in particular on Coleman's complaint about his attorney's erroneous statement in opening argument concerning where Coleman noticed the theft of his tires, the record does not convince us that the mistake would justify a new trial under the *Risher* criteria. The trial court, the prosecutor in his opening argument, and Coleman's attorney in his closing argument all explained to the jury that an attorney's remarks in opening argument do not constitute evidence.[19] Furthermore, the inaccuracy of the statement was never brought to the attention of the jury. Rather, outside the presence of the jury the prosecutor stated he would introduce testimony concerning the impossibility of seeing the parking area from Coleman's room in the Bergmann Hotel if Coleman testified to observing the

theft of his tires from that location. Coleman's own accurate testimony would have rendered this intended rebuttal fruitless, and minimized any prejudicial impact of his own attorney's opening remarks. Coleman's apparent failure to bring the error to either the court or his counsel's attention prior to his refusal to testify, despite being personally questioned by the trial judge about his reasons for deciding not to testify and being urged to testify, convinces us that any prejudice flowing from the mistake could have been avoided by actions which Coleman himself declined to take. To permit a defendant to refuse to testify, blame his refusal on a mistake by his attorney which his testimony would have corrected, and then demand a new trial on the grounds that his failure to testify affected the outcome of the trial, would encourage subversion of the judicial process and work against good-faith efforts by counsel to assist their clients.

Coleman's dissatisfaction with the legal assistance he was receiving appears to stem in large part from a broader distrust of the Public Defender Agency and the judicial system in general.[20] A consti-

---

18. The trial judge interrogated Coleman at the time he announced his decision not to testify, as well as hearing his complaints regarding attorney misconduct at the two prior hearings on motions for change of counsel. At these hearings, Coleman remained vague and noncommittal regarding specific instances of misconduct by his counsel, and his counsel's denials of any wrongdoing were never disputed by Coleman before the court prior to the end of the trial.

19. The prosecutor in particular stated that if any testimony differed from his opening remarks, the jury was to regard only the testimony as evidence.

20. The letter from Coleman to his attorney which, in part, prompted his attorney's request to withdraw from the case reads:

Mr. Lindsley, I have written to the N.A.A.C.P. Regional Office "for Alaska" requesting financial or personal assistance in obtaining private legal representation for the present cases. Due to the facts that I have not seen you since my last appearance in court and only four times since I was arrested and from things that I have been told by persons

checking into legal action on my behalf, caused me to consider this alternative.

I was told that you have been publicly disclosing facts concerning the case. Also telling people that I don't have a chance and asking those who know me to try and convince me to plead guilty. I find this to be a complete violation of my rights and attorney-client relationship even though nothing is shocking to me if it comes from the white side of the fence.

If I were paying you out of my pocket for your services you would provide more precise actions as far as the case is concerned but, since your salary is paid by State taxpayers you can afford to be undependable which is a large part of injustice. I can understand *now* why such a large percentage of the men in Alaskan jails are there—they were represented by Public Defenders. Defenders of the financially poor. Poor services for poor people—Right? This seems very logical in our *Green* society.

I am trying to get better counsel to represent me or financial assistance in hiring one. Therefore a continuance on the trial is desired. Sincerely, Coleman

tutional right to effective assistance of counsel does not encompass the right of a defendant to purposely frustrate his attorney's efforts on his behalf and then attempt to escape conviction on the basis of his own lack of cooperation. In the circumstances of this case, we agree with the superior court's apparent conclusion that appointing another attorney from the Public Defender Agency to represent Coleman would not have satisfied his complaints.

■ There remains Coleman's attorney's own request for withdrawal on the basis of ethical conflict in allowing Coleman to testify. ABA Disciplinary Rule 7–102(A)(4) prohibits a lawyer from knowingly using perjured testimony. Defense counsel believed Coleman's proposed testimony would be false on the basis of conversations with his client prior to Coleman's change of mind about pleading an insanity defense. We agree that an attorney is placed in a serious dilemma between his role as an advocate of his client's best interests and a guardian of the integrity of the judicial system when he is faced with the prospect of advancing testimony by his client which he thinks

false. However, we believe that no rights of the defendant were violated by the solution chosen by the superior court in this case. The ABA Standards Relating to the Prosecution and Defense Functions § 7.7 formerly provided,[21] as an alternative to withdrawal by the attorney, that the defendant be allowed to take the stand and give his testimony in narrative form, but that the attorney need not elicit the testimony by questioning nor argue the defendant's version of the facts. In *Thornton v. United States*, 357 A.2d 429 (D.C.App.), *cert. denied*, 429 U.S. 1024, 97 S.Ct. 644, 50 L.Ed.2d 626 (1976), cited with approval by this court in *Morrell v. State*, 575 P.2d 1200, 1209 (Alaska 1978), the attorney followed the approach outlined in the ABA Standards and the court found that no denial of effective assistance of counsel resulted. It follows that no such deprivation occurs when the attorney, as was ordered in the case at bar, is required to fully assist his client in presenting suspect testimony.

We are not ruling that the defense attorney here was automatically correct in revealing his position vis-a-vis his client to the

21. The ABA House of Delegates voted at its February 1979 meeting to defer its consideration of proposed revisions to Standard § 7.7, and refer the issue of client perjury in criminal cases to the Kutak Commission in connection with its work on the new Model Rules of Professional Conduct. (This was after two proposed revisions of Standard 7.7, one by the Standing Committee on Association Standards for Criminal Justice, commissioned in August 1977 by the ABA House of Delegates to revise all 18 volumes of the criminal justice standards, and the other by the Council of the Section of Criminal Justice.) In the interim, the ABA took no policy position on the issue. *See* The Failure of Situation-Oriented Professional Rules to Guide Conduct: Conflicting Responsibilities of the Criminal Defense Attorney whose Client Commits or Intends to Commit Perjury, 55 Wash.L.Rev. 211, 227 n. 89 (1979).

The Kutak Commission's approach establishes a general rule of disclosure to the trial court of the perjury, with an exception for jurisdictions in which it has been decided under "applicable law" that, in a criminal case, a client's rights to due process and the assistance of counsel require that counsel present the accused as a witness if the accused wishes to testify, even if counsel knows the testimony will be false. Discussion Draft of ABA Model Rules of Professional Conduct, Rule 3.1, Candor Toward Tribunal, and Comment. The impact on clients of this general rule favoring disclosure of the perjury is somewhat softened by the requirement that an attorney give a "*Miranda*-type" warning to the client in situations where the problem is likely to arise. Rule 1.4(b) reads:

A lawyer shall advise a client of the relevant legal and ethical limitations to which the lawyer is subject if the lawyer has reason to believe that the client may expect assistance not permitted by law or the rules of professional conduct.

The Kutak Commission's proposal has not yet been decided upon by the ABA, and is scheduled to undergo a revised draft before its submission to the ABA House of Delegates in February, 1981.

The Kutak Commission's approach to this issue has already drawn sharp criticism from the American Trial Lawyers' Association, which has formed its own Commission on Professional Responsibility and drafted its own version of "The American Lawyer's Code of Conduct". This is considerably more protective of the lawyer-client privilege than the Kutak Commission recommendation. See "ATLA Launches New Ethics Code in Tentative Draft Form", 27 Crim.L.Rep. 2313–15 (1980).

trial judge, or that this should be the appropriate resolution generally, or that the trial judge should always, when faced with this situation, order "full representation" as was done here. We only rule that, in this case, the decision of the trial judge removed any prejudice which might otherwise have impacted on the defendant for from this situation.

Appellant argues that following the ABA Standard mentioned above creates an unfair disadvantage to indigent defendants since they, unlike paying clients, are less able to dismiss an attorney who "knows too much" and to procure an attorney who, because of his ignorance, may advocate his client's case with undiluted vigor. Even if we accepted this premise *arguendo*, we would find it inapplicable here. Initially, we note that the paying client's option, the ability to hire a new and uninformed attorney, is not an unmixed blessing; such a course is fraught with danger for a defendant who, by keeping facts from his attorney, runs the substantial risk of having the prosecutor catch his attorney unaware and unprepared. Second, even accepting appellant's premise, we find that the trial court judge did not follow the course laid out by Standards 7.7, but instead instructed defense counsel to question the defendant on direct examination and to argue defendant's version of the facts:

> So long as the defendant is advised of the evidence against him, and advised of the potential consequences if he testifies and so long as the client—or the attorney has not knowingly permitted by suggestion or affirmative conduct the subornation of perjury by the defendant or one of the witnesses, I think he is obligated, if Mr. Coleman desires to testify to put him on the stand, to question him on direct examination. And he is required to argue the defendant's version of the facts.

We think this directive clearly indicated that, unless defense counsel had affirmatively initiated or furthered the use of per-

jury, he was to treat it as any other testimony. Under these circumstances, the defendant got the "best of both worlds"—an informed and aware attorney who could lay his suspicions aside. Again, we are not ruling that this course was necessarily the correct one from all perspectives; only that, from the defendant's perspective, no prejudice resulted.

■ Appellant further argues that the approach under Standard 7.7 "requires the attorney to abandon the position of advocate and become the defendant's judge and jury." Again, appellant's criticism is more appropriately leveled at the ABA Standard approach than at the approach taken in this case. We believe that to require counsel to fully advocate the client's version of the facts, despite suspicions regarding its veracity, clearly precludes counsel from displacing the function of the judge and jury in determining the guilt or innocence of a defendant.

We are not persuaded that appellant is correct in asserting that the preferable course would have been to allow defense counsel to withdraw. The Kansas Supreme Court rejected this suggestion in *State v. Henderson*, 205 Kan. 231, 468 P.2d 136 (1970). There, as here, defense counsel's motion to withdraw, upon discovery of his client's apparent desire to perjure himself, was denied; and the defendant subsequently decided against taking the stand. The court noted, "[h]ad the court granted counsel's motion to withdraw, the same predicament could easily have been precipitated by defendant with respect to any new counsel that might have been appointed." *Id.* at 142, 205 Kan. 231. We find this to be the case here also, and thus the decision made seems preferable in this case to permitting the attorney to withdraw, only to be replaced by counsel who must also discover the discrepancy in his client's position or remain ignorant of facts which the prosecution may bring out at trial anyway.[22]

---

**22.** *See* Freedman, *Professional Responsibility of The Criminal Defense Lawyer: The Three Hardest Questions*, 64 Mich.L.Rev. 1469, 1475–78 (1966). We recognize that Professor Freed-

man's position, premised on the advocate role of the defense attorney and the presumption of innocence accorded defendants in our criminal law system, has been criticized for its potential

■ Even if the defendant had not gotten the full benefit of counsel at trial, we are not convinced that a change in counsel would have affected the outcome of the trial. The state marshalled considerable testimony and physical evidence to establish that Coleman committed the alleged crimes. Coleman's proposed defense consisted of his own testimony that, although he met with B.E., he did not rape or assault her, and the testimony of three witnesses to corroborate his alleged motive for meeting with her. Coleman's proposed testimony had already been contradicted by that of the investigating officer regarding Coleman's denial of meeting B.E. at the place in question. Additionally, the prosecutor made an offer of proof that he would introduce further evidence of Coleman's guilt, including prior incriminating statements by Coleman and impeachment evidence against one of Coleman's proposed witnesses, if Coleman presented his defense. Other than defense counsel's mistake in opening argument, which could have been corrected by Coleman's own testimony, Coleman has not persuasively argued how obtaining counsel with which he would cooperate would change the above facts. Given this conclusion, we cannot hold that Coleman is entitled to a new trial on the basis of any deficiency in the performance of his trial counsel.[23]

■ Finally, appellant argues that the judge's awareness of the difficulties between counsel and client might have been prejudicial to the client when appellant was sentenced. This is a possibility noted in the commentary to former Standard 7.7, which states in part, "[I]f the trial judge is informed of the situation, the defendant may be unduly prejudiced, especially at sentencing . . . ." ABA Project on Standards for Criminal Justice, Standards Relating to the Prosecution Function and the Defense Function, Commentary to Standard 7.7, at 277 (Approved Draft 1971). However, we reject this for several reasons: first, the sentencing judge's discussion of reasons for the sentence imposed did not mention this incident as a factor in sentencing, and we will not presume that it was. Further, the defendant here did not commit perjury—he did not take the stand. Last, even assuming that the alleged aborted attempt at perjury had taken place and was taken into account by the sentencing judge, this would not necessarily be impermissible. A sentencing judge may take into account his belief that the defendant committed perjury at trial, as long as it is used as an indication to determine the defendant's potential for rehabilitation, and not as a basis for enhancing the sentence as punishment for the alleged perjury. *Strachan v. State,* 615 P.2d 611 (Alaska, 1980); *see also United States v. Grayson,* 438 U.S. 41, 98 S.Ct. 2610, 57 L.Ed.2d 582 (1978).

IV. Sentence appeal.

The rape and assault of B.E. took place within two months after Coleman was released on parole from sentences for prior convictions on two counts of rape and one count of robbery. *Coleman v. State,* 553 P.2d 40 (Alaska 1976). The second rape was committed while Coleman was released on bail pending trial for the robbery and first rape. Coleman has now been sentenced to

---

effect on the integrity of the trial process and the moral autonomy of the defense attorney, both of which are considered conducive to vigorous defense advocacy. *See* Polster, *The Dilemma of the Perjurious Defendant: Resolution, Not Avoidance,* 28 Case W.L.Rev. 3 (1977). However, as noted above, we are not adopting this approach generally, but rather noting that, when it is followed, it is difficult to see in what way defendant is prejudiced.

**23.** *See United States v. Campbell,* 616 F.2d 1151 (9th Cir. 1980), in which, despite defense counsel's having announced in the presence of the jury that defendant was testifying against advice of counsel, which the court held improper, the conviction was upheld:

> The mistake is one which a "reasonably competent attorney" might make in an effort to comply with his ethical duties. Further, even if a mistake shows a lack of reasonable competence, the accused must show that he was prejudiced by the error before his conviction can be reversed. The record contains overwhelming evidence that Campbell committed the crime charged. He has failed to show the required prejudice.

*Id.* at 1152 (citation omitted).

thirty years for his third rape conviction and ten years for the assault with a dangerous weapon charge. These sentences are to be served consecutively to each other and consecutively to nearly five years remaining of the concurrent sentences imposed for Coleman's robbery and prior rape convictions. Coleman is required to serve twenty of the thirty years imposed for the rape of B.E. before he will be eligible for parole. This sentence is notable for its length and restrictions on parole—Coleman, a twenty-six-year-old man at the time of sentencing, will serve anywhere from twenty to forty-five additional years in prison. Coleman argues that the sentence is excessive on several grounds. However, we have concluded from a review of the record that the superior court was not "clearly mistaken" in imposing the sentence it did. *McClain v. State*, 519 P.2d 811, 813–14 (Alaska 1974).

 Coleman first argues that the superior court gave inadequate attention to the goal of rehabilitation in imposing sentence. Our review of the record shows, on the contrary, that the sentencing judge indicated he considered rehabilitation as fully

as the other criteria for sentencing set out in *State v. Chaney*, 477 P.2d 441 (Alaska 1970). However, he found Coleman showed little potential for rehabilitation. He also concluded that the goal of rehabilitation and that of protection of the public from dangerous offenders, another factor to be considered in sentencing under Chaney, were in conflict after reviewing Coleman's record, psychiatric reports, and available rehabilitative programs. Given the seriousness of the crimes of which Coleman was convicted and his demonstrated extreme tendency towards recidivism, we do not find it to be an abuse of discretion that the trial court de-emphasized the goal of rehabilitation in relation to the other factors to be considered in sentencing.[24]

 Coleman also asserts that the trial court was clearly mistaken in classifying him as a "worst offender", for which the maximum sentence for a crime is justified, and also erred in following the requirements of the "habitual offender" statute, AS 12.55.050, to effectively double the maximum allowable sentence which could be imposed for each offense.[25] Essentially,

24. *See Bell v. State*, 598 P.2d 908, 915–16 (Alaska 1979); *Gordon v. State*, 501 P.2d 772, 777 (Alaska 1972). In particular, we have previously recognized that recidivism demonstrated by the proximity in time of a defendant's crimes to each other or to his release from prior incarceration, is a significant factor in assessing a sentence. *Torres v. State*, 521 P.2d 386, 389 (Alaska 1974); *Robinson v. State*, 484 P.2d 686, 690 (Alaska 1971).

In *Newsom v. State*, 533 P.2d 904, 911 (Alaska 1975), we further observed that in rape cases, "[a]lthough the perpetrator of such a crime may not be beyond rehabilitation, which the judge recognized in this case, the crime itself deserves community condemnation; in addition to serving rehabilitative purposes the sentence must reflect such condemnation as well as act as a deterrent to the offender and to others." *See also State v. Wassilie*, 578 P.2d 971, 974–75 (Alaska 1978); *State v. Lancaster*, 550 P.2d 1257, 1259–60 (Alaska 1976).

25. Following the trial, the state charged Coleman with being convicted of the robbery and the two prior rapes for the purpose of requiring the court to invoke the habitual offender statute. The state stipulated and the court agreed, however, that because the short time between the offenses afforded but one effective opportunity for rehabilitation, they should be treated as

one prior felony conviction for the purposes of sentencing under the habitual offender statute. *Carlson v. State*, 560 P.2d 26 (Alaska 1977). The habitual offender statute in effect at the time of sentencing provided with respect to one prior felony conviction:

AS 12.55.050(1): If the person is convicted of a felony which would be punishable by imprisonment for a term less than his natural life, and has previously been convicted of one felony, then he is punishable by imprisonment for not less than the minimum nor more than twice the longest term prescribed for the felony of which that person is convicted.

The maximum sentence for rape at this time was 20 years under AS 11.15.130(c), and that for assault with a dangerous weapon 10 years under AS 11.15.220. Thus, invoking the habitual offender statute increased the maximum authorized sentences to 40 years and 20 years respectively. Therefore, the sentence ultimately imposed for the rape conviction is 10 years longer than the normal maximum sentence, but 10 years shorter than that authorized for the worst offender under the habitual offender statute; the sentence for the assault equalled the maximum sentence normally permitted, but

Coleman complains that he is not the worst type offender and that his two prior convictions for rape were used both to authorize imposing the maximum sentence and to increase the range of the allowable maximum sentence. We observe, however, that the sentencing judge based his classification of Coleman as a worst offender on the basis of the proximity of the three criminal episodes in terms of time during which Coleman was free from prison, and the presentence report conclusion that Coleman suffered no physical or mental impairment that would absolve him from knowledge that the crimes were wrongful. Behavior showing dangerous propensities which pose a clear risk to the public, the nature and circumstances of a crime, and other factors contained in the presentence report may justify a "worst offender" classification, *Wilson v. State*, 582 P.2d 154, 156 (Alaska 1978), as well as prior criminal convictions. *State v. Wortham*, 537 P.2d 1117, 1120 (Alaska 1975). The extreme danger which Coleman has shown he poses to the rest of society leads us to conclude that the superior court was not clearly mistaken in classifying him as a "worst offender." Further, since the basis for this classification went substantially beyond the fact of a prior felony conviction to encompass the circumstances of all of Coleman's crimes and the propensities of the offender, we do not think the court erred by following the requirements of the habitual offender statute initially to authorize a higher maximum sentence.

■ Coleman next argues that because the assault was "corollary" to the rape in space, time, and motivation that a concur-

rent, rather than consecutive, sentence less than the maximum should have been imposed for the assault with a dangerous weapon conviction. We note first that the sentence imposed was one-half what was authorized as a maximum under the habitual offender statute. Regarding the consecutive nature of the sentence, we refer to our decision in *State v. Occhipinti*, 562 P.2d 348 (1977), in which we held that the societal interests violated by the crimes of rape and assault with a dangerous weapon are sufficiently distinct, even where the offenses are intertwined in a single episode of violence toward another person, to justify separate sentences. In that case we left it open on remand for the trial judge to impose consecutive or concurrent sentences for the two separate offenses. Here, it was after B.E. had pulled up her clothes and thought her assailant was through with her that he stopped her from leaving and submitted her to fear of grave bodily injury apart from the violation of her personal dignity associated with the rape.[26] In such circumstances, imposing consecutive sentences was not clearly mistaken.[27]

■ Finally, Coleman argues that the sentence was the result of racial bias on the part of the sentence judge. However, the specific allegations of prejudice which Coleman recites were on the part of the prosecuting attorney, and not the sentencing court. While we disapprove of the prejudicial connotations in the prosecutor's remarks referenced to by Coleman, we cannot agree that they establish any racial bias in the sentencing procedure followed by the trial judge.[28] Coleman has also submitted a

was one-half that allowed under the habitual offender statute.

These sentencing statutes have since been replaced by the provisions of the new Alaska Criminal Code.

**26.** The crime of rape "amounts to a desecration of the victim's person which is a vital part of her sanctity and dignity as a human being," apart from any fear of physical harm. *State v. Occhipinti*, 562 P.2d 348, 351 (Alaska 1977), *quoting Newsom v. State*, 533 P.2d 904, 911 (Alaska 1975).

**27.** *Cf. Hunter v. State*, 590 P.2d 888, 903 (Alaska) *appeal after remand*, 596 P.2d 23 (Alaska 1979), where this court questioned whether thefts of separate items from separate owners, but in a single incident, were sufficiently distinct in terms of societal interests violated to justify separate consecutive sentences, but did not hold that to impose them would be clearly mistaken.

**28.** The prosecuting attorney made the following remarks in closing argument, and a similar statement before the trial judge when arguing against defense counsel's motion for a continuance to allow substitution of counsel:

statistical study by the Alaska Judicial Council on sentencing patterns which he contends shows his sentence to exceed the expected mean sentence for this category of crime by fifty percent.[29] This evidence goes beyond a mere showing that black persons tend generally to receive higher sentences than persons of other races, unlike the statistical evidence held to be insufficient to establish racial bias in particular sentences in *Bell v. State*, 598 P.2d 908 (Alaska 1979) and *Campbell v. State*, 594 P.2d 65 (Alaska 1979). However, the evidence submitted still falls short of the standard which we stated was required to establish a claim of racial bias in sentencing in those cases—an indication that Coleman's sentence "was probably higher than that which would have been imposed upon a defendant of a different race with a like criminal history who committed a similar offense." *Bell v. State*, 598 P.2d at 916; *Campbell v. State*, 594 P.2d at 69. We recognize that Coleman's combined sentence is significantly higher than sentences in other rape and assault with a deadly

weapon convictions that this court has reviewed and approved,[30] but do not believe that there are any convictions sufficiently comparable in terms of the seriousness of the combined offenses and the defendant's prior criminal record for us to conclude that the length of the sentence was probably due to racial prejudice and not a consideration of the legitimate factors discussed here and by the superior court in the sentencing hearing.[31]

The sentencing judge was presented with the unique and very serious circumstances of a defendant convicted of forcible rape for the third time, his second rape closely following his release into the community after arrest for the first, and the third closely following his release on parole after serving sentences for the two prior offenses. In addition, his most recent crime was accompanied by the threat of death or grave injury to the victim subsequent to the rape. Given the evidence of the extreme danger to other persons which this defendant poses and his indicated lack of potential

---

Do you think you would enjoy coming in here and getting up in front of all you folks, getting in front of everyone else and telling how you were jogging and a black man came and put his penis in your mouth and ejaculated and you had to go home and vomit and clean your mouth?

In *Hunter v. State*, 590 P.2d 888, 903 (Alaska 1979), where the sentencing judge made derogatory comments to defendant during sentencing which at least one Justice considered to have arguably racial connotations, the sentence was affirmed against charges of racial bias under the "clearly mistaken" standard but was remanded for resentencing on other grounds.

29. *See* Alaska Judicial Council, Alaska Felony Sentencing Patterns: A Multivariate Statistical Analysis (1974–76).

30. This court has approved sentences for rape ranging from 6 to 30 years. *See Mallott v. State*, 608 P.2d 737 (Alaska 1980) (30 years with 15 years suspended); *Moore v. State*, 597 P.2d 975 (Alaska 1979) (15 years); *Morrell v. State*, 575 P.2d 1200 (Alaska 1978) (8 concurrent 10-year sentences on 8 counts); *Nukapigak v. State*, 562 P.2d 697 (Alaska 1977) (6 years); *Coleman v. State*, 553 P.2d 40 (Alaska 1976) (2 concurrent 10-year sentences on 2 counts); *Newsom v. State*, 533 P.2d 904 (Alaska 1975) (15 years); *Ames v. State*, 533 P.2d 246 (Alaska) *modified on other grounds*, 537 P.2d 1116 (Alaska 1975) (8 years); *Torres v.*

*State*, 521 P.2d 386 (Alaska 1974) (20 years concurrent with existing 10-year sentence); *Newsom v. State*, 512 P.2d 557 (Alaska 1973) (15 years); *Gordon v. State*, 501 P.2d 772 (Alaska 1972) (10 years).

Sentences up to 12 years have been affirmed for assault with a dangerous weapon, with the most severe sentences involving either prior felony convictions or injury to the victim.

*See, e. g., Sielak v. State*, 581 P.2d 226 (Alaska 1978), (10 years, drunken attack on wife with kitchen knife, cutting her hand; new sentence after failure of defendant to complete alcoholic treatment program ordered as a condition of probation; long history of prior offenses including 3 prior convictions for assault with a deadly weapon); *Johnson v. State*, 580 P.2d 700 (Alaska 1978) (12 years; offender with prior felonies, long history of juvenile placement, and assault committed while on parole); *Joe v. State*, 542 P.2d 159 (Alaska 1975) (10 years; 8 prior felonies and 60 misdemeanors).

31. As we stated in *Walls v. State*, 598 P.2d 949, 951 (Alaska 1979), "While such statistical information may be of some assistance in determining whether a sentence is excessive or too lenient, sentencing depends on the peculiar facts and circumstances involving the particular offense and the particular offender."

for rehabilitation, we cannot agree that the sentence imposed was clearly mistaken.

AFFIRMED.