Charles SMITHART, Appellant,

v.

STATE of Alaska, Appellee.

Nos. A–5138, A–5378.

Court of Appeals of Alaska.

Oct. 31, 1997.

Larry Cohn, Anchorage, for Appellant.

John A. Scukanec, Assistant Attorney General, Office of Special Prosecutions and Ap-

peals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

MANNHEIMER, Judge.

Charles Smithart appeals his convictions for kidnapping, AS 11.41.300(a)(1)(C), first-degree sexual assault, AS 11.41.410(a)(1), and first-degree murder, AS 11.41.100(a)(1). He questions three of the trial court's evidentiary rulings. Having reviewed the record, we conclude that two of the trial court's rulings were correct and the error in the third ruling was harmless. We therefore affirm Smithart's conviction.

*Factual background*

On the afternoon of August 22, 1991, at approximately 3:00 p.m., eleven-year-old M.L. disappeared as she walked to a friend's house near the Tazlina Trading Post, a store located on the Richardson Highway between Glennallen and Copper Center, near the confluence of the Tazlina and Copper Rivers. She was last seen at 2:50 p.m., walking along Tazlina Terrace Drive. Around 4:30, M.L.'s father began searching the area. An hour later, still unable to find his daughter, he contacted an Alaska State Trooper and told him that his daughter was missing.

Beginning that evening, law enforcement officers and members of the community participated in various search efforts. Ten days later, on September 1st, M.L.'s body was found in a wooded area known as the Indian Subdivision, located between Tazlina Terrace Drive and Copper Valley School Road. M.L.'s body bore numerous bruises and abrasions, including linear marks on her ankles indicating that she had been tied up. She was partially disrobed, and a later examination revealed that she had been sexually assaulted. She had been shot twice in the head.

The ensuing criminal investigation ultimately focused on Smithart, a retired pipeline worker who lived at Mile 105½ of the Richardson Highway, approximately six miles from the scene of the abduction. David DeForest reported seeing Smithart's truck turning from the Richardson Highway onto Tazlina Terrace Drive at approximately 3:00 p.m. on the day of the crime. Smithart's cousin, Tanya Nutter, reported seeing Smithart's truck driving on Copper Valley School Road two hours later (at approximately 5:00 p.m.), headed out of the Indian Subdivision toward the Richardson Highway. These two roads, Tazlina Terrace Drive and Copper Valley School Road, are the only roads off the Richardson Highway affording direct access to (and egress from) the Indian Subdivision.

Smithart was interviewed by the state troopers, who confronted him with their suspicions that he had been involved in the crime. Smithart declared that he was invariably home at 3:00 in the afternoon so that he could watch his favorite television shows ("Wheel of Fortune" and "Jeopardy"), and then he and his mother would eat dinner at 6:00. In short, Smithart told the troopers that he was at home on the afternoon of August 22nd.

Smithart further asserted that M.L. had never been in his truck, and he told the troopers that no one had borrowed his truck on August 22nd. Smithart reacted somewhat strangely, however, when the troopers suggested that evidence had been found in his truck: Smithart responded by asking the troopers whether M.L.'s hair or jewelry had been found in his truck, and whether there was a bloodstain on the seat.

During the ensuing days, Smithart showed a marked interest in the search for M.L.'s body and the overall progress of the investigation. After the body was discovered, Smithart conducted his own independent search for evidence connected to the crime. In addition, Smithart made statements to the trooper investigators which indicated that Smithart had knowledge of certain details of the crime that had not been made public.[1]

During the investigation, Smithart made repeated statements to the troopers and to

---

1. For example, on September 7th (six days after M.L.'s body was found), Smithart mentioned to Investigator Churchill that he had seen a trooper helicopter flying over the area. Smithart asked if the troopers were looking for articles of M.L.'s clothing. Smithart then volunteered that, if M.L.'s shoes were missing, and if the shoes had been thrown into the river, they would have

residents of Copper Center indicating his sexual interest in girls as young as eleven and twelve years old. Moreover, Smithart, an Alaska Native, repeatedly volunteered (both to the authorities and to Copper Center residents) that he did not pick up white girls, and that he never tried to pick up young girls who were jogging. Smithart volunteered many of these comments during conversations that had nothing to do with his activities on the day in question.

The troopers collected trace samples of metal flakes, paint chips, carpet fibers, and hair from M.L.'s body and clothing. These were compared to samples obtained from Smithart's truck. Two head hairs with physical characteristics consistent with M.L.'s hair were found in Smithart's truck. According to the State's expert witness, paint chips found in M.L.'s clothing (a yellow chip and an orange chip) matched paint samples taken from Smithart's truck. (A defense expert testified that the orange chips did not match and that the yellow chips were questionable.) Samples of red and blue "trilobel" fibers (a fairly distinctive carpet fiber) obtained from M.L.'s clothing were identical to fibers taken from Smithart's truck. In addition, tiny metal spheres found in M.L.'s clothing were similar to metal particles found in Smithart's workshop and truck, but the State's expert could not determine whether these metal particles came from a common source.

Smithart's basic defense was alibi.[2] Acquaintances of Smithart testified that he invariably stayed home in the afternoons between 3:00 and 4:00 to watch "Wheel of Fortune" and "Jeopardy". More important was the testimony of Darlene Craig (the wife of Smithart's cousin) and Lucille Brenwick (Smithart's mother, who resided with him), both of whom claimed to have been with Smithart throughout the afternoon of August 22, 1991.

According to testimony given by Craig and Brenwick, Craig and her husband visited the Smithart–Brenwick residence on the afternoon of August 22nd because Craig wished to sell Brenwick some wild blueberries and an afghan blanket. Craig was certain that she and her husband arrived at 3:20 and stayed until 5:15. (Brenwick testified that the Craigs might have stayed a little later—until 5:30 or 6:00.) Craig and Brenwick both asserted that Smithart was at home during the entire visit.

To corroborate this testimony, both Craig and Brenwick identified the check that Brenwick had written to Craig to pay for the berries and the rug. This check, number 6012 in the amount of $70.00, was dated August 22, 1991.

However, Smithart's alibi was substantially weakened when the prosecutor cross-examined Brenwick about her check register. The check register contained an entry for the check Brenwick wrote to Darlene Craig (check number 6012). The next entry in Brenwick's register was check number 6013, a check for $45.42 that Brenwick wrote to the Copper River Cash Store (a grocery store), also on August 22nd. Brenwick testified that she must have gone to the grocery store later that evening, after Craig and her husband had left. However, the prosecutor then confronted Brenwick with the cash register tape from the Copper River Cash Store; this register tape showed that Brenwick's $45.42 grocery purchase was rung up at 3:17 p.m.. Thus, Craig's August 22nd visit to the Smithart–Brenwick residence apparently was over before 3:00 in the afternoon, because Brenwick was purchasing groceries with her next check (number 6013) at 3:17—the approximate time of M.L.'s abduction and the time for which Smithart needed an alibi.

The jury convicted Smithart of kidnapping, sexual assault, and murder. Superior Court Judge Glen C. Anderson sentenced Smithart to a composite term of 114 years in prison.

*Did the trial judge commit error in allowing the State to introduce evidence of Smithart's attempts to offer rides to two young girls, K.G. and J.M.?*

Before Smithart's trial, the parties litigated whether the State would be allowed to

floated downstream from the area being searched. M.L.'s shoes were indeed missing, but the troopers had not released this detail to the public.

**2.** Additionally, as noted above, Smithart presented expert testimony that the paint particles found on M.L.'s body did not match the samples obtained from Smithart's vehicle.

introduce evidence of Smithart's contacts with two young girls in the weeks just prior to M.L.'s abduction. As indicated above, during the investigation of M.L.'s disappearance, Smithart repeatedly told the troopers that he would never pick up white girls "because it would look bad" and that he would "never pick up girls who were jogging". On September 22, 1991 (three weeks after M.L.'s body was found), Smithart told the troopers that he never tried to pick up a particular teenage girl who worked at a local business. The troopers' suspicions were aroused by Smithart's repeated denials, so they began to investigate the possibility that Smithart had approached other young girls.

K.G., a 15–year–old girl, reported that she had been jogging near Copper Center in July 1991 when Smithart drove by in his truck. Driving alongside her, Smithart mouthed the words, "Would you like a ride?" K.G. recognized Smithart because he frequented her family's restaurant in Copper Center. When K.G. did not accept the offer, Smithart drove on. However, a short time later, Smithart (now heading in the opposite direction) drove by K.G. again, and he again mouthed the question, "Would you like a ride?" Again, K.G. did not accept the ride. Smithart drove by K.G. a third time; this time, he motioned for K.G. to come over to his truck. K.G. shook her head and kept on jogging.

One week later, Smithart went to the place where K.G. worked and told her that if she ever needed a ride, he would be happy to give her one.

On September 12th (eleven days after M.L.'s body was found), P.G., the mother of K.G., chanced to meet Smithart at a local restaurant. At that time, P.G. did not know anything about Smithart's attempt to get K.G. to accept a ride in his vehicle. However, P.G. did know that Smithart's mother had just undergone eye surgery, so she asked Smithart how his mother was doing. Smithart became upset and replied, "What the fuck does my god-damned mother have to do with this?" Smithart then told P.G., "By the way, I saw your daughter jogging, and I didn't pick her up because it wouldn't look right to the community." That night, because of Smithart's remark, P.G. asked her daughter if Smithart had ever tried to pick her up; this is how Smithart's approach to K.G. was revealed.

Another young girl, 14–year–old J.M., contacted the troopers after she recognized a photograph of Smithart that appeared in the newspapers in November 1991 (following his arrest). At trial, J.M. testified that she had been riding her bicycle on the Richardson Highway near Glennallen in August 1991 (before M.L.'s abduction) when she heard a truck come up behind her. The truck slowed down as it passed her, and the driver waved to her. The driver of the truck paced J.M. for a short distance, but he sped up when another vehicle came down the road.

After the other vehicle had gone, J.M. saw the truck's brake lights come on, and the truck started to turn around. J.M. turned her bike and headed in the opposite direction, toward her home. The truck came after her and pulled up even with her again. The driver waved again and mouthed, "Hello." At that point, another vehicle approached, and the driver of the truck sped up again. J.M. described the driver of the truck as "[a]n older Native-looking man" with "black hair and ... with a little bit of gray." She identified Smithart in a photographic line-up. At trial, J.M. conceded that she was "not a hundred percent sure" that Smithart was the man in the truck, but she stated that Smithart "really closely resemble[d]" that man.

The prosecuting attorney argued that Smithart's attempts to pick up K.G. and J.M. were evidence of his planning or preparation to abduct a young girl like M.L. The prosecutor also argued that Smithart's attempts to pick up K.G. and J.M. showed Smithart's fixation with young girls of a particular physical description. From photographs contained in the record, it appears that both K.G. and J.M. bore a striking resemblance to M.L.—so great a resemblance that when K.G.'s mother saw a sketch of M.L. in the newspaper on the day after the disappearance, she thought the sketch was of her own daughter.

Smithart argued that the testimony of K.G. and J.M. was barred by Alaska Evidence

Rule 404(b), but Judge Anderson ruled that this evidence was admissible to prove Smithart's identity as M.L.'s abductor. Judge Anderson noted that both K.G. and J.M. bore a strong physical resemblance to M.L. The judge also noted that, before the troopers knew of the incidents involving K.G. and J.M., Smithart made numerous statements specifically denying the very conduct described by the two girls. Judge Anderson expressed some doubt whether K.G.'s and J.M.'s testimony actually fell within the prohibition of Evidence Rule 404(b) since the evidence, by itself, did not reveal any other crime or immoral conduct. Nevertheless, the judge concluded that the evidence was admissible under Rule 404(b).

Smithart challenges this ruling on appeal. He argues that the sole purpose of K.G.'s and J.M.'s testimony was to show that Smithart had an interest in young girls and was therefore the type of man who would abduct M.L. Thus, in Smithart's view, the girls' testimony was "propensity" evidence barred by Evidence Rule 404(b).

Evidence Rule 404 governs the admission of evidence concerning a person's character; within that rule, section (b) is by far the most litigated portion. At the time of Smithart's trial, Rule 404(b) stated:

(1) Evidence of other crimes, wrongs, or acts is not admissible if the sole purpose for offering the evidence is to prove the character of a person in order to show that the person acted in conformity therewith. [Such evidence] is, however, admissible for other purposes, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

(2) In a prosecution for a crime involving physical or sexual assault or abuse of a minor, evidence of other acts by the defendant toward the same or another child is admissible to show a common scheme or plan if admission of the evidence is not precluded by another rule of evidence and if the prior offenses

(i) are not too remote in time;

(ii) are similar to the offense charged; and

(iii) were committed upon persons similar to the prosecuting witness.

■ Evidence of Smithart's approaches to K.G. and J.M. in the weeks just before the abduction and murder of M.L. was admissible under subsection (2) of this rule. The charges against Smithart involved both physical and sexual assault upon a minor. Smithart's attempts to pick up K.G. and J.M. occurred in the weeks preceding the abduction/murder. Both K.G. and J.M. were young females of essentially the same age as M.L., and M.L.'s murderer appears to have made the same kind of approach to M.L. as Smithart did to K.G. and J.M.—approaching the girls in a vehicle as they traveled by foot or bike along a sparsely traveled road, inviting them inside.

The fact that this evidence was admissible under Rule 404(b)(2) constitutes a short answer to Smithart's contention that the evidence should have been excluded because it proved his "propensity" to engage in sexual misconduct with minors. Even assuming that this evidence would be characterized as "propensity" evidence for purposes of Rule 404(b)(1), Rule 404(b)(2) declares that the evidence is nonetheless admissible.

■ Moreover, we alternatively hold that the evidence of Smithart's approaches to K.G. and J.M. was not offered as "propensity" evidence. Evidence Rule 404(b)(1) contains the general rule governing the admission of evidence that a person has committed other crimes or wrongful acts. Under Rule 404(b)(1), evidence of a person's other wrongful acts is not admissible "if the sole purpose for offering the evidence is to prove the character of a person in order to show that the person acted in conformity therewith", but such evidence is admissible if it is relevant for any other purpose. Our cases use the term "propensity" as judicial shorthand for the forbidden purpose stated in Rule 404(b)(1): "to prove the character of a person in order to show that the person acted in conformity therewith".

If evidence has no genuine purpose other than to show the defendant's character and the consequent likelihood that the defendant acted in conformity with that character dur-

ing the episode being litigated, then Rule 404(b)(1) declares that the evidence shall not be admitted. If, on the other hand, the judge determines that the evidence is genuinely relevant for some other purpose, then the judge must weigh the evidence under Evidence Rule 403, considering whether the probative value of the evidence on the non-propensity issue(s) outweighs its potential for unfairly prejudicing the defendant by suggesting his or her criminal propensity. *Miller v. State*, 866 P.2d 130, 133 (Alaska App. 1994); *Lerchenstein v. State*, 697 P.2d 312, 315–16 (Alaska App.1985), *aff'd*, 726 P.2d 546 (Alaska 1986).

▮ As one of the leading evidence texts candidly admits, "the distinction between acts offered to prove propensity and acts offered for another purpose is not easily drawn". Stephen A. Saltzburg, Michael M. Martin, and Daniel J. Capra, *Federal Rules of Evidence Manual* (6th ed.1994), Rule 404, p. 322. The authors do, however, suggest the following test:

> [W]e think that it is helpful to consider whether the factfinder is [being] asked to engage in a two-step reasoning process: to infer from [a person's] behavior on one occasion something about the nature of [the] person[,] and then to infer from [the person's nature] how the person probably would have behaved on another occasion when the only connection between the two occasions is that the factfinder believes that people of a certain type would act the same way both times.

*Federal Rules of Evidence Manual*, pp. 322–23. In other words, Rule 404(b) bars evidence of the defendant's other wrongful acts if the only relevance of those other wrongful acts is to show that the defendant is a person who, by nature, engages in such wrongful acts, and if there is no connection between

those prior acts and the episode being litigated other than the assumption that people of a certain character would act the same way on both occasions.[3]

Using this test, we conclude that Smithart's approaches to K.G. and J.M. were admissible for non-propensity purposes under Evidence Rule 404(b)(1). We acknowledge that Smithart's approaches to these two girls potentially showed that he was a man of questionable character—a man who showed sexual interest in young girls. And under Rule 404(b)(1), this evidence would not have been admissible if its sole ground of relevance had rested on the assertion that any man who was generally sexually interested in young girls was the kind of person who was likely involved in the abduction, sexual assault, and murder of the young girl in this case, M.L. But under the facts of Smithart's case, this evidence had a more specific, tightly defined relevance.

The contested evidence did not merely show that Smithart had a general sexual interest in young girls. Rather, the evidence tended to show that Smithart had a fixation on the type of young girl involved in this case. K.G., J.M., and M.L. all bore unusual physical resemblance to each other. All three were girls in their younger teens, all three were blond-haired, and all three had strikingly similar facial features. In the weeks just prior to M.L.'s abduction and murder, Smithart approached both K.G. and J.M. while they were alone on sparsely-traveled roads; in each case, Smithart tried to convince the girls to accept a ride in his vehicle. M.L. had been walking alone along a sparsely-traveled road when she disappeared, and the State's evidence strongly suggested that M.L. had been enticed into a motor vehicle when she was abducted.[4] After M.L.'s abduction, Smithart went out of his way to tell several people (including

---

3. For a thoughtful law review article discussing this test, see Richard B. Kuhns, "The Propensity to Misunderstand the Character of Specific Act Evidence", 66 Iowa Law Rev. 777 (1981).

4. M.L. was last seen walking along Tazlina Terrace Drive; her body was found in an undeveloped subdivision some distance away, in an area not on her intended route of travel. From the accounts of the adults who had last seen M.L.,

and from the statements of the children who, walking the other way, should have seen M.L. if she had continued along her intended path, it appeared that M.L. had rather abruptly disappeared from the road—which suggested that she had been transported by vehicle. Because there was no sign of struggle on the road, the jury could also reasonably infer that M.L. had voluntarily entered this vehicle.

K.G.'s mother) that he would not try to pick up young caucasian girls in his truck.

Under these circumstances, the relevance of Smithart's approaches to K.G. and J.M. did not rest merely on the assumption that people having a certain general trait of character (people sexually interested in young girls) could be expected to act in conformity with that trait of character if given the opportunity to be alone with a young girl. Taken together, the timing of Smithart's approaches to K.G. and J.M., the circumstances under which Smithart approached these two girls, the two girls' striking resemblance to M.L., and Smithart's over-eagerness to deny that he had engaged in such conduct (before the police were even aware that this conduct had occurred), establish that Smithart's approaches to K.G. and J.M. had a case-specific relevance—that is, a nonpropensity relevance—to the issues litigated at Smithart's trial.

We concede that there is no ready dividing line between prior acts that reveal only the defendant's propensity to commit that same type of wrongful act, and prior acts that reveal a genuine case-specific ground for believing that the defendant committed the crimes being litigated. However, both this court and the supreme court have confronted a similar issue in a slightly different context—in prosecutions for sexual assault where evidence of the defendant's other sexual assaults is introduced to prove that the defendant was the person who committed the sexual assault being litigated.

In *Coleman v. State*, 621 P.2d 869 (Alaska 1980), the supreme court discussed the question of how to determine whether prior crimes are so distinctive that, aside from showing the defendant's bad character, they independently tend to establish the defendant's identity as the perpetrator of the crime at issue. The supreme court gave the following explanation for admitting evidence of another sexual assault committed by Coleman:

> The testimony showed [that] the two crimes shared common elements in the race and age of the victims, the situs chosen for the attack, the manner of subduing the victim, the type of intercourse which occurred, and the behavior of the assailant following the attack. Both victims were relatively young caucasian women, and were on foot near a wooded area when attacked. Each indicated that the first awareness of the assailant's presence was the sound of running footsteps behind her, and that the first realization that she was being assaulted was when the attacker placed his arm around her throat, choking her. In both instances, the attacker rapidly propelled the victim from behind, with his arm still around her throat, into the woods. In both instances oral intercourse was performed as well as an effort at vaginal intercourse (the prior rape also involved anal intercourse). Following both attacks the assailant discussed whether the victim would report him to the police, and allowed the victim to walk away. These characteristics are not so unique as to constitute a "signature crime," as one commentator suggests should be required to prove like identity, nor is each of the above common features material standing alone. But a review of cases in this and other jurisdictions indicate that the similarities in the attacks, taken together, compare favorably with other instances where evidence of prior rapes has been held properly admitted for the purpose of proving identity.

*Coleman*, 621 P.2d at 875 (footnotes omitted).

As noted in this passage, the supreme court did not insist that Coleman's prior crime be so distinctive as to represent his "signature" (so distinctive as to practically identify him from among all other potential culprits). Rather, the court asked whether, under the totality of circumstances, Coleman's other sexual assault bore a striking enough similarity to the crime being litigated that it took on a probative aspect above and beyond the fact that Coleman might be a repeat rapist.

We applied a similar analysis in *Harmon v. State*, 908 P.2d 434 (Alaska App.1995). In *Harmon*, we concluded that evidence of the defendant's prior sexual assaults was admissible because those assaults were sufficiently distinctive and similar to the offense being litigated. Each of Harmon's victims was a

white single female who had previously met Harmon in a social setting and had rejected his offers of a romantic relationship. Each victim was sexually assaulted in her home shortly after midnight; each victim was also beaten. In each case, Harmon was armed with a knife and had used electrical cord to tie up his victims. *Harmon,* 908 P.2d at 437–38.

Smithart's case is arguably distinguishable from *Coleman* and *Harmon* in one respect: Smithart's prior approaches to K.G. and J.M. did not end in abduction or assault. Standing by themselves, these prior acts appear at most to be suspicious or distasteful; it is only in retrospect that they take on a more sinister visage. Even so, Smithart's approaches to K.G. and J.M. share so many case-specific similarities with the abduction and murder of M.L. that evidence of these approaches was admissible under Rule 404(b)(1). As the supreme court noted in *Coleman,* these similarities need not be so unique as to constitute a "signature crime", nor do the various common features need to be persuasive when viewed individually. But, taken together, they establish a pattern of behavior that exhibits probative force above and beyond the mere fact that Smithart might like to offer rides to, or have a general sexual preference for, young girls. We thus conclude that this evidence was genuinely relevant for a non-propensity purpose.

■ The remaining question is whether the evidence would create a risk of unfair prejudice to outweigh its probative value. We agree with Judge Anderson that the risk of unfair prejudice was slight. Smithart's contacts with K.G. and J.M. were not criminal. By themselves, they tended only to show that Smithart liked to invite (and perhaps pester) young girls into his truck. The jury was unlikely to put weight on this evidence outside its proper scope of relevance.

Having reviewed the facts of Smithart's case, we conclude that Judge Anderson did not abuse his discretion when he ruled that Smithart's contacts with K.G. and J.M. were admissible on the issue of whether Smithart was the person who abducted M.L.

*Did the trial judge allow the State to introduce inadmissible "profile" evidence of Smithart's guilt?*

Smithart's next contention on appeal concerns the testimony of State Trooper Sergeant James McCann. Sergeant McCann was the lead investigator in this case; in his testimony, he described the progress of the investigation and how the authorities had come to suspect Smithart. Smithart claims that some of McCann's testimony was inadmissible.

Prior to trial, Smithart sought a protective order against the State's introduction of testimony regarding the psychological or behavioral profile of sexual murderers. Judge Anderson granted this protective order. The judge ruled that police witnesses would be permitted to explain why the investigation focused on Smithart, but he made it clear that the prosecution would not be permitted to suggest that there was some scientific or statistical basis for the investigators' suspicions:

THE COURT: I'll permit [an investigator] to say if it is ... his or her experience that person[s] [whom] they ultimately develop as suspects interject themselves into an investigation. I think that's proper, and I'll permit that kind of testimony—to say [that] that's not unusual or not uncommon. [But to] say that ... there's some scientific basis for it, or anything beyond an individual witness's experience, or [to] even suggest ... that a certain percentage do and a certain percentage don't, I would preclude that kind of evidence.

During McCann's direct examination, the following colloquy occurred:

PROSECUTOR: You were aware ... that this [murder investigation] involved a sexual assault as well, is that correct?

McCANN: Yes.

PROSECUTOR: What did that mean to you, as an investigator?

McCANN: It meant an awful lot to me, really.... I have learned, through my own experience and that of my colleagues, and through the literature, that sexual murderers have a certain type of behavior. Now, they don't always—

At this point, McCann's incomplete answer drew an objection from Smithart's attorney. The jury was excused, and Judge Anderson reiterated his earlier ruling. The jury was then resummoned, and McCann's testimony resumed.

PROSECUTOR: Sergeant McCann, what were you telling other investigators [to look] for?

McCANN: Well, ... one of the first things I did was to assign an investigator ... to go to the fire hall, [which was] a central place of gathering and assignment-giving for [the] searchers, [and I told this investigator] ... to look for anyone that perhaps had acted unusual in any way, and to ... talk with [the search] organizers [to see] if they had seen someone there [who] was acting unusual or out of the ordinary.... [I told the same thing to] all of the other investigators on the task force[.] They knew [that] that [was] something I wanted to know about. And we discussed the fact that we're looking for someone who may be interjecting himself into this investigation where he normally would not. Someone who was overly concerned. And certainly someone who, after the body was found, [showed] particular interest in [the] area [where the body was found].

Later in his testimony, McCann described how the investigation had come to focus on Smithart:

PROSECUTOR: [W]hat were the factors that you took into consideration [when you made Smithart] the focus of your investigation?

McCANN: Well, ... there were many factors. All these things that we've [already] discussed—about how we first got to know who Charlie Smithart was, [and] all the contacts with him, all the comments.... All these sorts of things started to ... create a picture for us. And that, combined with the eyewitness testimony from David DeForest, and Mr. Smithart's interjecting himself into this investigation, his focus on the area of the four-wheel drive roads where [M.L.]'s body was found, when no one else did. Everybody else was organized, everybody else was searching other areas together, [but] Mr.

Smithart from day one—and, I think in his words, [for] four or five days there later—spent all his time right down there in that particular area where [M.L.] was eventually found. He had intimate knowledge of that area, of the gullies, the bluffs, the what-have-you. He knew it was a good place to throw a body off the bluff. He knew a lot about that area, and [he] admitted that no one else drives down there or would know where the hell they were going. All those things—his interest in the clothing, specifically in the shoes, [was] very interesting and certainly would eventually make him [the] number-one suspect.

On appeal, Smithart portrays Judge Anderson's ruling as a rejection of Smithart's objection and, in effect, a rescission of the protective order that the judge had earlier granted. Smithart contends that McCann's ensuing testimony was filled with forbidden "profile" evidence.

We do not agree. The first-quoted portion of McCann's testimony (in which he started to tell the jury about the things he had learned "through the literature" about the behavior of sexual murderers) constituted an impending violation of Judge Anderson's protective order. When Smithart objected, Judge Anderson sustained the objection. The judge noted that McCann had not been qualified as a psychological expert, and he declared that his ruling with respect to such profile evidence remained "the same". The judge cautioned the prosecutor and McCann to limit McCann's testimony to such things as "Mr. Smithart's interjection into the case". When McCann resumed his testimony, he made no further reference to "the literature" or to the scientifically established behavioral characteristics of sexual murderers.

■ Smithart argues that, even though McCann made no further reference to scientific or statistical studies, his ensuing testimony still constituted "profile" evidence because McCann discussed the inferences that might be drawn from Smithart's behavior—his unusual degree of interest in the progress of the investigation, and his keen interest in the area where M.L.'s body was found.

This was not "profile" evidence within the meaning of such cases as *Haakanson v. State,* 760 P.2d 1030, 1036–37 (Alaska App. 1988), *Anderson v. State,* 749 P.2d 369, 373–74 (Alaska App.1988), and *State v. Braham,* 67 Wash.App. 930, 841 P.2d 785, 789–790 (1992). The jury did not need to hear expert testimony to understand the potential relevance of Smithart's unusual interest in the search for the missing girl and, later, the murder investigation. The inference to be drawn from Smithart's behavior rests on common life experience, not scientific or statistical studies. We uphold Judge Anderson's ruling on this issue.

*Did the trial judge commit error by denying Smithart the opportunity to argue that the crimes might have been committed by David DeForest?*

Prior to trial, Smithart's attorney filed a motion seeking permission to introduce evidence that other (unspecified) suspects had committed the abduction/murder. The prosecution responded with a request for a protective order that would prohibit the defense from introducing evidence that another person had committed the crime, at least until the defense made a specific showing that such evidence was admissible. These competing pleadings, supplemented by oral motions at trial, engendered a series of rulings and clarifications concerning Smithart's ability to introduce evidence that David DeForest (the man who reported seeing Smithart on Tazlina Terrace Road) had actually committed the crime.

*(a) The law on this subject.*

Beginning with the Alaska Supreme Court's decision in *Marrone v. State,* 359 P.2d 969, 984–85 (Alaska 1961), Alaska law has restricted a defendant's ability to introduce evidence that someone else committed the crime. It might be argued that a defendant should be able to present any evidence tending to establish the possibility, no matter how remote, that another person could have committed the crime. However, the rule has traditionally been more stringent. As the Alaska Supreme Court explained in *Marrone,*

[The essentially unanimous rule is] that mere evidence of [another person's motive to commit the crime], or [even] of motive coupled with threats [made by] such other person, is inadmissible unless coupled with other evidence tending to directly connect such other person with the actual commission of the crime charged.... [The] sound basis for this rule ... rests fundamentally upon the [concept] that evidence to be admissible must be both relevant and material. [The rule] rests upon the necessity that trials of cases must be both orderly and expeditious, [that] they must come to an end, and that it should be a logical end.... [I]t is necessary that the scope of inquiry into collateral and unimportant issues must be strictly limited. It is quite apparent that if evidence of motive alone upon the part of some other person were admissible, that in a case involving the killing of a man who had led an active and aggressive life it might easily be possible for the defendant to produce evidence tending to show that hundreds of other persons had some motive or animus against the deceased; that a great many trial days might be consumed in the pursuit of inquiries which could not be expected to lead to any satisfactory conclusion.

*Marrone,* 359 P.2d at 984 n. 19 (quoting *People v. Perkins,* 59 P.2d 1069, 1074–75 (Cal.App.1936)) (internal citations omitted).

■ As indicated in *Marrone,* most courts enforce the rule that evidence of another person's guilt, to be admissible, must do more than simply raise the suspicion that the other person may have committed the crime. Rather, the evidence must "tend[ ] to directly connect [this] other person with the actual commission of the crime charged". However, as is true with many other legal rules, it is much easier to state the rule in the abstract than to apply the rule to a given case. Smithart's appeal requires us to look more closely at the *Marrone* rule.

It is apparent, from the supreme court's explanation, that the *Marrone* rule rests on the same considerations that are embodied in Alaska Evidence Rules 401, 402, and 403. First, only relevant evidence is admissible— "relevant" meaning "having any tendency to

make the existence of any [material] fact ... more probable or less probable than it would be without the evidence". Second, even though evidence is relevant, a court still has the authority to exclude the evidence "if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury". The *Marrone* rule is, in essence, an attempt to apply this balancing of probative value against prejudicial impact in the specific context of evidence offered to show that a third party committed the crime.

As the commentary to Evidence Rule 401 recognizes, "[r]elevancy is not an inherent characteristic of any item of evidence". Rather, relevancy is the "relation between an item of evidence and a matter properly provable in the case", a relation revealed by "experience or science, applied logically to the situation at hand". Commentary to Evidence Rule 401, fourth paragraph. Similarly, the question put by *Marrone*—whether evidence "tends to directly connect" another person to the crime—must be answered in the factual context of the defendant's particular case.

For instance, the law has traditionally placed little probative value on character evidence—evidence that a person has committed the same or similar acts in the past, offered to demonstrate that the person has a "propensity" to commit the kind of crime being litigated. This court has repeatedly affirmed trial court rulings that a defendant can not introduce evidence that another person has been convicted of a crime similar to the one charged against the defendant, when this evidence is offered for the purpose of demonstrating that the other person has a propensity to commit the kind of crime charged against the defendant. *D'Antorio v. State*, 837 P.2d 727, 736 (Alaska App.1992); *Brandon v. State*, 839 P.2d 400, 413 (Alaska App.1992). This is true even when the other person was present at the scene of the crime. *Jordan v. State*, 895 P.2d 994, 999 (Alaska App.1995).

This same rule is applied in other states. For example, in *State v. Briggs*, 55 Wash. App. 44, 776 P.2d 1347 (1989), the defendant was accused of attacking several women in a particular area of Seattle. *Id.*, 776 P.2d at 1349. The Washington Court of Appeals upheld the trial court's refusal to allow the defendant to introduce evidence that a man named Abram, who resembled the defendant and who had a record of purse-snatching, had been stopped by the police during a stake-out of the area. The court ruled that this evidence did not establish a sufficiently direct connection between Abram and the crimes for which Briggs stood accused. *Id.* at 1359–60.

On the other hand, this court has ruled that evidence of another person's prior commission of similar crimes can be admissible if, combined with all the other circumstances of the case, this evidence tends to establish a real possibility that the other person committed the crime charged against the defendant. In *James v. State*, 671 P.2d 885, 892–94 (Alaska App.1983) *rev'd on other grounds*, 698 P.2d 1161 (Alaska 1985), the defendant was tried for assault. This court held that the defendant should have been able to present testimony tending to establish that another person (1) was present when the assault occurred and (2) had uttered contemporaneous threats of violence against the victim.

This court recognized that, under *Marrone*, "threats by a third person against the victim may not be shown unless coupled with other evidence having an inherent tendency to connect such other person with the actual commission of the crime". *James*, 671 P.2d at 893 (quoting *Marrone*, 359 P.2d at 984). However, this court indicated that *Marrone*'s foundational requirement would be satisfied if the defendant presented evidence

> sufficient to establish that the third party alleged to have threatened the assault victim was present at the scene of the offense when it occurred or otherwise had the opportunity to commit the crime. To require more would in effect ... establish a requirement of independent proof [of the third party's guilt] rather than of corroboration [of the defendant's contention].

*James*, 671 P.2d at 893.

A different variation of this problem was presented in *Garner v. State*, 711 P.2d 1191 (Alaska App.1986). The defendant was

charged with killing his girlfriend's infant child through physical abuse. Only two people could have inflicted the child's injuries: Garner or J.H., the next-door neighbor who had watched the child for part of the day. *Id.* at 1192. Garner asked the trial court for permission to introduce the testimony of two witnesses who had seen J.H. abuse her own child. The trial judge ruled that Garner could cross-examine J.H. about these alleged instances of child abuse but could not introduce independent evidence on this point. *Id.* at 1193. On appeal, this court reversed:

> In Garner's trial the issues were tightly focused. [The child] died from injuries which were [undeniably] the result of child abuse, and either Garner or J.H. inflicted the injuries. There was no question that J.H. had the opportunity to inflict the injuries since she had been alone with [the child].
>
> Under these circumstances it was particularly critical for Garner's defense to present evidence which suggested that J.H., not Garner, had inflicted the injuries which killed [the child]. We agree with [the trial judge] that the offered evidence had some weaknesses[.] However, the jury could have reasoned that if J.H. had abused her own daughter, she might have been the person who abused [the child in this case].

*Garner*, 711 P.2d at 1194 (citations & footnotes omitted).

*Garner* is instructive because of the light it sheds on the meaning of the *Marrone* requirement of evidence "tending to directly connect" the other person to the crime. In *Garner*, there was no eyewitness who could "directly connect" J.H. to the infliction of the child's injuries. However, the same was true of the State's case against Garner himself. The State's case was circumstantial, based largely on the fact that Garner had been alone with the child during the time when the injuries were inflicted, coupled with evidence tending to show that Garner had abused the child in the past. 711 P.2d at 1192. This court held that, under these circumstances, Garner was entitled to present the same kind of circumstantial case against J.H.

Other courts have reached similar conclusions in cases where the government's evidence against the defendant was circumstantial. For instance, in *State v. Clark*, 78 Wash.App. 471, 898 P.2d 854 (1995), the defendant was tried for arson. The government asserted that Clark had been heavily in debt and had set fire to his own office to collect the insurance proceeds. Clark defended by asserting that his girlfriend's estranged husband, Arrington, had set the fire to retaliate against Clark for having an affair with his wife, and also because Arrington believed that Clark had sexually molested his 15–year–old daughter. 898 P.2d at 856–57.

Clark offered to prove Arrington's motives to retaliate against him. In addition, Clark offered to prove: (1) that, two days before the fire, Arrington called the phone company and, falsely representing himself to be Clark, had Clark's telephone disconnected; (2) that a note was found, written by Arrington, with Clark's phone number on one side and the fire marshall's phone number on the other; (3) that Arrington's whereabouts at the time of the fire were unknown; (4) that Arrington had stated that it was "too bad" that Clark was in jail for something he did not do, and that he (Arrington) was the reason that Clark was in jail; (5) that witnesses had seen Arrington's truck pull into Clark's driveway twice during the two weeks immediately preceding the fire; (6) that notes written by Arrington indicated that he was keeping track of Clark's movements; (7) that, two months before the fire in Clark's office, Arrington had threatened his estranged wife, telling her that she had better "watch it" because he (Arrington) had learned in the military how to set fires without being detected; and (8) that the firefighters who responded to the fire found a broken window in Clark's office. *Id.*

Washington follows a rule much like the *Marrone* rule. As stated by the Washington court in *Clark*,

> [W]hen a defendant seeks to introduce evidence connecting another person with the charged crime, a proper foundation must be laid:
>
>> Before such testimony can be received, there must be such proof of connection with the crime, such a train of facts or circumstances as tend clearly to point

out someone besides the accused as the guilty party.

> Mere evidence of another party's motive, or motive coupled with threats by such other person, is inadmissible, unless coupled with other evidence tending to connect such other person with the actual commission of the crime charged.

*Clark*, 898 P.2d at 857–58 (citations omitted). Nevertheless, the Washington court concluded, the trial judge had been wrong to exclude Clark's evidence against Arrington:

> [But] if the prosecution's case against the defendant is largely circumstantial, then the defendant may neutralize or overcome such evidence by presenting sufficient evidence of the same character tending to identify some other person as the perpetrator of the crime.

*Clark*, 898 P.2d at 858 (citation omitted). The court ruled that Clark had presented a sufficiently strong circumstantial case against Arrington to warrant admission of this evidence under Washington's version of the *Marrone* rule. Thus, Clark was entitled to a new trial. *Id.* at 859. *See also State v. Hamons*, 248 Kan. 51, 805 P.2d 6, 12–13 (1991) (holding that when the government's murder case against the defendant was circumstantial, it was error to refuse to allow the defendant to introduce evidence tending to show that two other people, both having a motive to commit the crime, had recently argued angrily with the victim and were at the scene of the crime on the day the victim's body was discovered).

■ Thus, even though the *Marrone* rule calls for evidence that tends to "directly connect" the other person to the crime being litigated, it is possible (depending on the facts of the particular case) for a defendant to meet this foundational requirement by offering a sufficiently substantial circumstantial case against that other person. This follows from the fact that the admissibility of such evidence is ultimately governed by a balancing of probative force versus potential for prejudice. The concepts of "probative force" and "potential for prejudice" can not be evaluated in a factual vacuum; these concepts can be assessed only in the context of the other evidence presented at trial and the parties' theories of the case. Thus, circumstantial evidence of another person's guilt can properly be excluded when, viewed in light of the other evidence in the case, it does no more than raise speculative possibilities. When, however, the evidence as a whole discloses a substantial possibility that the defendant has been wrongly charged, a trial judge would abuse his or her discretion to exclude the offered evidence of third-party guilt.

There is admittedly some imprecision in this rule. On the one hand, *Marrone* calls upon a trial judge to exclude evidence of another person's guilt when its probative value is outweighed by its tendency to confuse the issues and divert the jury from its proper task. On the other hand, if the defendant's offered evidence reaches a certain threshold of probativeness, it should be admitted; at that point, it is the jury's function, not the trial judge's function, to determine the ultimate credibility of that evidence. As stated above, the proper classification of the defendant's offer of proof must rest on the facts of the particular case. The best that an appellate court can do is provide guidance to trial judges by clarifying the principles that should inform their decisions in this area.

■ One facet of *Marrone* deserves special emphasis. The *Marrone* rule restricts a defendant's ability to introduce evidence when the purpose of that evidence is to show that another person may have committed the crime(s) for which the defendant is charged. Like many other rules of evidentiary exclusion (for example, the hearsay rule), the *Marrone* rule merely states that evidence is not admissible if it is offered for a particular prohibited purpose. *Marrone* restricts a defendant's ability to introduce evidence when the sole relevance of the evidence is to show that someone besides the defendant committed the crime. However, when evidence is primarily relevant for a different purpose, *Marrone* does not require exclusion of the evidence simply because it might also have the subsidiary effect of suggesting that someone else committed the crime.

This is not to say that trial judges are to ignore the potential improper use of the evidence. Under Alaska Evidence Rule 403,

trial judges have the discretion to exclude evidence if its proper probative force is outweighed by the danger that the jury will use the evidence for an improper purpose. In combination, the *Marrone* rule and Evidence Rule 403 authorize a trial judge to exclude evidence whose primary purpose is to prove someone else's guilt, even if the evidence is arguably relevant for some other purpose.

■ One other aspect of *Marrone* also merits emphasis. *Marrone* is an evidentiary rule; it does not directly control the scope of a defendant's argument to the jury. A party is allowed to argue any inference that can be fairly drawn from the evidence. *Dorman v. State*, 622 P.2d 448, 461 (Alaska 1981); *Sam v. State*, 842 P.2d 596, 600 (Alaska App.1992). As explained above, even when the *Marrone* rule is correctly applied, evidence admitted for other purposes may reasonably suggest that another person committed the crime. If such evidence has been admitted, *Marrone* does not forbid the defendant from arguing this inference, nor does *Marrone* bar the defendant from naming a specific suspect if the evidence logically suggests that person.

### (b) The trial judge's initial Marrone ruling at the time of Smithart's opening statement

As described above, Smithart's attorney filed a pre-trial motion seeking permission to introduce evidence that other people could have committed the abduction/murder, and the prosecution answered with a request for a protective order. These motions were heard three weeks before Smithart's trial. At that time, Smithart's attorney told Judge Anderson that he would be glad to present his evidence that other people might have committed the abduction/murder, but he would only do so *ex parte* because he did not want to reveal his case to the prosecutor. Judge Anderson was unwilling to hear an *ex parte* offer of proof, at least until Smithart presented some legal authority for such a procedure. The judge then made a preliminary ruling on the prosecutor's motion:

> [The defense] must make a presentation prior to offering that evidence.... [The prosecutor's motion] only asks that there be a hearing; and, at this point, I won't

determine whether it can be *in camera* or not.

. . .

> I do want to make it clear, though, [that] I'm not preventing the defendant from [suggesting], from the beginning, ... that other people could have committed this offense, in the abstract, without naming names. I see no problem with that ... in [the defense] opening statement.

Three weeks later, just before the defense delivered its opening statement (at the beginning of trial), Smithart's attorney sought the court's permission to suggest in the opening statement that a specific individual—David DeForest—had committed the kidnapping/murder. The defense attorney offered to prove that DeForest had been on Tazlina Terrace Drive near the time of the abduction, that DeForest had given inconsistent statements regarding his whereabouts on the afternoon of August 22, 1991, that DeForest's shop was a possible source of paint chips and metal particles such as were found on M.L.'s clothing, that DeForest was on felony probation (having been convicted of attempted burglary in New York), that DeForest (contrary to the conditions of his probation) possessed firearms, including a .22 caliber weapon (the type of firearm believed to be the murder weapon), and that the parents of a 15–year–old girl had accused DeForest of having (consensual) sex with their daughter (a charge which the daughter denied).

In the ensuing discussion, the prosecutor asserted that DeForest's statements concerning his whereabouts were in fact consistent, that DeForest had never lied to the authorities, and that the sexual abuse of a minor accusation was not pursued because it was not true. Also, in response to questioning from the court, Smithart's attorney conceded that he had not sought forensic testing of the paint and metal particles from DeForest's shop, so he had no way of knowing if they matched the evidence found on M.L.'s clothing.

Based on *Marrone* and *Garner*, Judge Anderson denied the defense request to single out DeForest as an alternative suspect during the opening statement. The judge

concluded that Smithart's offered evidence failed to directly connect DeForest to the crime, thus failing to meet the foundational requirement established in *Marrone:*

> THE COURT: *Marrone* provides that [even if there is] a person who is in a position to commit the offense, ... there has to be some evidence directly connecting that person with the offense. What's suggested here in terms of that "some evidence" is [DeForest's] presence at the scene [and his] inconsistent statements. I suspect there will be a lot of witnesses in this trial where persons will point to prior ... inconsistent statements, or at least those that one party or another may wish to construe as inconsistent. I'm less than clear how inconsistent [DeForest's statements] are at this point. [The defense also states] that he was a person who worked in an area where there was grease and paint of multiple colors. No showing as such that would directly connect him with the occurrence of the criminal event. No apparent showing that would connect him directly with the victim of that event. Nothing of that kind of character other than the kinds of things that could apply potentially to quite a number of people in the Glennallen area. I suspect there are other people who work around grease, paint, and so on. That does not meet the standard that is set out in those cases.

However, Judge Anderson took some pains to explain that he did not interpret *Marrone* as precluding Smithart from introducing evidence that suggested DeForest's guilt. Judge Anderson told the defense attorney that such evidence could be introduced if it was relevant on some independent ground:

> [I]f Mr. DeForest made inconsistent statements, [evidence of those statements] is admissible just under [the] general rules of impeachment; ... of course, the defense is not denied the opportunity to do that.... [W]ith regard to the possibility of bias, if there's any indication that there might have been a deal cut with the State, or even slack cut ... to Mr. DeForest because of his status as a potential witness in the case, ... [then] the defense certainly has a right to inquire into the possibility

of that bias [*i.e.,* DeForest's prior felony conviction and probation status]. I think ... that's clear. It really has nothing to do with whether he's possibly a suspect or not. It's admissible....

In the discussion that immediately followed, Judge Anderson clarified that Smithart's attorney would still be able to suggest that the State's evidence did not point exclusively to Smithart. For example, Judge Anderson noted, Smithart's attorney could point out that other people besides Smithart worked in shops where they might have picked up paint and metal particles. The *Marrone* rule, Judge Anderson explained,

> focuses on individual [accusations]—you know, getting into a [specific] other suspect. [Notwithstanding *Marrone*, you] can suggest that there are other possible people who committed this offense. It appears identity is a major issue. I don't think the defense is ever denied [the] opportunity ..., in opening statement or otherwise, to suggest that there are a lot of other people who ... could have committed this offense ... [but] without focusing on a particular one.

Judge Anderson then reiterated that *Marrone* did not prohibit Smithart from introducing any and all evidence that might cast suspicion on someone else. The judge told the defense attorney that "some of the things [you mentioned as tending to cast suspicion on DeForest] are things that ... would be admissible anyway, either as impeachment or to show bias", assuming DeForest testified. Judge Anderson explained,

> [My] ruling [is] an evidentiary one[.] [Y]ou may not offer discrete evidence, or argue from such evidence, that [DeForest] is [the] person who committed the offense. That's the evidentiary rul[e] arising from [*Marrone* and] the three or four [other] cases that deal with [this issue]. And I [also] want to clarify ... that, the extent that we're talking about a possible universe of people other than Mr. Smithart who may have committed the offense, I'm not foreclosing that, and I didn't intend to.

For instance, Judge Anderson ruled that Smithart's opening statement could include the assertion that DeForest had falsely de-

nied being on Tazlina Terrace Drive on the afternoon of the crimes, that DeForest worked on vehicles in a shop, and that De-Forest did welding and grinding.

When Smithart's attorney suggested that he should also be able to introduce evidence that the floor of DeForest's garage was covered with orange paint, and that DeForest had been working on a truck on the day of the abduction, Judge Anderson told him:

> My ruling is that you may not get into those areas [if the purpose is] just [to] connect [DeForest] with the crime. There would have to be another independent basis for [those things] to be offered into evidence.
>
> . . .
>
> What I'm trying to indicate is that, to the extent [you wish to introduce] discrete evidence on [the issue of DeForest's guilt], I think you have to make a stronger showing than the one [you have] made now. . . . [But] I'm not prohibiting the defense from suggesting that there's a universe of people out there, which could conceivably include Mr. DeForest, [who] could have committed the offense.

At the end of this discussion of *Marrone,* Judge Anderson explicitly told Smithart's attorney that the various aspects of his ruling were not final. Smithart was invited to present any "additional fact[s] that would justify . . . reconsideration" of the judge's conclusion that Smithart had not yet satisfied the *Marrone* foundational requirement. As Judge Anderson told the defense attorney, "I think I've left the door open for a stronger showing, . . . one that would meet the evidentiary standard. But I don't see it there yet." Judge Anderson also clarified that, even if the *Marrone* requirement was not met, so that Smithart was restricted in his ability to introduce independent evidence of DeForest's guilt, Smithart was still free to seek admission of evidence tending to show De-Forest's guilt if it was "admissible for any other purpose".

Judge Anderson's extended ruling, examined as a whole, correctly states some aspects of the *Marrone* rule and misstates others. Judge Anderson correctly informed the defense attorney that, before Smithart could introduce evidence whose sole purpose was to prove that DeForest might have committed the crime, Smithart had to satisfy *Marrone*'s foundational requirement of evidence "tending to directly connect" DeForest to the abduction/murder. Judge Anderson also correctly informed the defense attorney that if evidence had an independent ground of relevance, then *Marrone* would not bar its admission, notwithstanding the fact that the evidence tended to suggest that DeForest (or anyone else) had committed the crime.

■ However, Judge Anderson misconstrued *Marrone* when he enjoined Smithart from using his opening statement to single out DeForest as the likely perpetrator of the abduction/murder. As we explained above, the *Marrone* rule limits the introduction of evidence, but it does not limit a party's ability to argue all reasonable inferences from the evidence that is admitted. If, despite *Marrone*'s restriction on the introduction of independent evidence that DeForest committed the crime, it was clear that sufficient evidence would be introduced at Smithart's trial to warrant a reasonable inference that DeForest might be the perpetrator, then Smithart would be entitled to announce this inference in his opening statement.[5]

It appears that Smithart's opening statement was influenced by this mistaken expansion of the *Marrone* rule. In his opening statement (which was delivered just minutes

---

5. Given the contradictory offers of proof made by Smithart's attorney and the prosecutor, there was arguably considerable uncertainty as to whether major portions of the evidence mentioned by the defense attorney would ultimately prove to be (1) substantiated and (2) admissible. It must be remembered that Judge Anderson was being asked to render a prospective evidentiary ruling based solely on the competing assertions of the two attorneys. Under these circumstances, a trial judge might reasonably decide that it was impossible to tell whether the evidence admitted at trial would ultimately support a reasonable inference that DeForest had committed the crime—and that therefore it would be better to restrict the content of the parties' opening statements until the underlying evidentiary issues were resolved. However, the record indicates that Judge Anderson's ruling was based on his interpretation of *Marrone* rather than any uncertainty about the various items in the defense attorney's offer of proof.

after Judge Anderson's ruling), Smithart's attorney asserted that Smithart had not been the one who abducted and murdered M.L.—that Smithart had been home watching television when the crime occurred. And, after explaining Smithart's alibi, the defense attorney spent several minutes focusing on DeForest, "the only person who can put Charlie Smithart in the area".

Smithart's attorney told the jury that DeForest was a convicted felon who had avoided jail by agreeing to move to Alaska; that, in Alaska, DeForest had married a sixteen- or seventeen-year-old girl who was already pregnant; that DeForest had given inconsistent statements concerning his own whereabouts on the afternoon of August 22, 1991; that DeForest had been in Smithart's truck on various occasions; that when the state troopers asked DeForest to substantiate his own whereabouts, DeForest gave the troopers an altered time sheet; that DeForest himself had been on Tazlina Terrace Drive on the afternoon of the abduction/murder; that, in violation of his probation, DeForest possessed several firearms, including a .22; and that DeForest had lied during his testimony at two search warrant hearings. In sum, Smithart's attorney declared, "Dave DeForest didn't see Charlie Smithart on August 22, 1991. Dave DeForest has weaved a tale of deception, and, oh, what a tale we weave when we are lying." However, constrained by Judge Anderson's ruling, Smithart's attorney stopped short of openly accusing DeForest of being the one who had abducted and killed M.L.

### (c) Smithart's cross-examination of prosecution witnesses and presentation of his own case

Consistent with the ruling described in the previous section, Judge Anderson allowed the defense attorney free rein in cross-examining the State's witnesses, even when that cross-examination clearly suggested that David DeForest was another likely suspect in the abduction/murder of M.L.

DeForest himself was one of the prosecution's early witnesses. Just before the defense attorney commenced his cross-examination of DeForest, he asked Judge Anderson for permission to question DeForest about his workshop and the type of work he had been performing on vehicles (grinding and welding) on the day of the crime. Judge Anderson responded,

> You can cross-examine in those areas pretty much at will, such as [the] grinder and what [DeForest] was doing that day.... The evidentiary ruling I made earlier was based on specific case law [that] talks about when you can offer affirmative evidence of [another person's guilt]. The scope of cross-examination is obviously much broader, and should be.

In the same vein, Judge Anderson allowed Smithart's attorney to ask DeForest about an inconsistent statement he had allegedly made to another witness, a statement which arguably placed DeForest closer to the scene of the abduction than he had admitted to the state troopers.

In an effort to establish that DeForest was not being truthful concerning his whereabouts on the afternoon of the crime, Smithart's attorney cross-examined DeForest at length about his time sheets and his method for keeping track of his hours. Judge Anderson never employed *Marrone* to restrict this cross-examination. During the cross-examination of DeForest, the defense attorney openly suggested that DeForest did not always fill out the time sheets contemporaneously, but instead filled out the time sheets some days later. The defense attorney suggested that DeForest had done this when the troopers asked him to produce the time sheet for the day of the abduction/murder. DeForest admitted that he never signed the time sheet for August 22, 1991 until the troopers asked him to produce it. The defense attorney also pointed out that, regardless of when the time sheets were completed, no one but DeForest himself could verify the hours written on those sheets.

Smithart's attorney also employed cross-examination to suggest that DeForest had invented the story of seeing Smithart's vehicle on Tazlina Terrace Drive on the afternoon of the crime. DeForest conceded that he failed to tell the troopers about seeing Smithart's vehicle until September 10th—

eighteen days after the abduction, and nine days after M.L.'s body was discovered. DeForest also conceded that he never told anyone (until trial) that he himself had driven some distance into the neighborhood on the day of the crime. Again, Judge Anderson never employed *Marrone* to restrict this cross-examination.

On the stand, DeForest admitted that there was grease, metal, and paint around his workshop, and that paint could have gotten into his hair. DeForest also admitted that he had lied during direct examination when he denied owning a handgun; following that false testimony, he had surrendered a .22 caliber pistol to the state troopers.[6]

While DeForest was on the stand, Judge Anderson again clarified that the *Marrone* rule did not restrict Smithart's ability to suggest, through cross-examination, that DeForest was personally involved in the abduction/murder. Rather, *Marrone* only restricted Smithart's ability to introduce independent evidence of DeForest's guilt:

> THE COURT: [O]n cross-examination, there can be suggestions and implication[s] that this man [DeForest] ... may have been involved [in the homicide] himself. I mean, that's fair game on cross-examination. My prohibition on that point has only gone to the introduction of independent evidence.
>
> . . . .
>
> [T]here have been questions on cross-examination that have suggested [that DeForest had an] improper motive [for altering his time sheets].... [T]here's been a suggestion that [DeForest] may have had something to do with [M.L.'s] disappearance—[a subject that], as I've indicated, on cross he can be asked about: questions regarding what was at his shop, questions regarding where he was with regard to [Tazlina Terrace Drive], and how far he got [down the road].... [C]ross-examination [can properly] touch on [these] point[s].

Throughout the defense attorney's lengthy cross-examination and recross-examination of DeForest, Judge Anderson never prevented Smithart's attorney from inquiring into any of these areas.

Later in the trial, during Smithart's cross-examination of State Trooper Investigator David Churchill, the defense attorney again suggested that DeForest was lying about his own whereabouts on the afternoon of the crime, and was also lying about seeing Smithart's vehicle near the scene of the abduction. Investigator Churchill admitted that, during the intensive search for M.L.'s body, DeForest did not mention having seen Smithart in the area on August 22nd. And, even though DeForest claimed that he had telephoned police dispatch on August 30th or 31st to report that he had information about the case, Churchill conceded that the police had no dispatch tape or dispatcher's written notation to verify that such a call had been made. Churchill also conceded that, when DeForest volunteered to show the troopers his time sheets for August 22nd, DeForest gave the officers the "short" form of his time sheet; but he never mentioned that there was a longer, more complete version of the time sheet.

The prosecutor interposed one *Marrone* objection during the examination of Investigator Churchill. The issue came up because, during cross-examination, Smithart's attorney repeatedly faulted the troopers for failing to tape record their interviews with DeForest. Then, during recross-examination, Smithart's attorney elicited the fact that Churchill routinely taped all his interviews with suspects and with people who had information about suspects:

> DEFENSE ATTORNEY: Now, regarding taping, you're required by law to tape anybody in custody, right?
>
> CHURCHILL: That's correct.
>
> DEFENSE ATTORNEY: Okay. And in this particular case you also indicated that you taped suspects, right? ... [And] people that may have information about a suspect.

---

**6.** This weapon was tested by firearms experts. The parties later stipulated that DeForest's pistol was not the murder weapon.

CHURCHILL: ... As an investigation comes into focus on a particular person as being a viable suspect, ... that's when I started taping.

DEFENSE ATTORNEY: Right. You taped the conversation with Earl Hardesty. That was somebody [other] than Charlie Smithart. Right?

CHURCHILL: That's correct.

DEFENSE ATTORNEY: Okay. And you taped the interview ... with Bill Hand. That was somebody different than Charlie Smithart. Right?

CHURCHILL: Yes, it was.

DEFENSE ATTORNEY: You taped Chris Rhodes. That was somebody different than Charlie Smithart.

CHURCHILL: Yes, it was.

DEFENSE ATTORNEY: Okay. So you taped people that had information about other potential suspects?

CHURCHILL: Yes, I did.

DEFENSE ATTORNEY: Okay. [But] you didn't tape Dave DeForest ever about any information he had regarding Charlie Smithart.

CHURCHILL: No, I did not.

A few minutes later, during a break in the proceedings, the prosecutor asserted that Smithart's attorney had violated the protective order by "specifically asking Investigator Churchill whether or not he taped other potential suspects". The prosecutor argued that, under the court's ruling, the defense attorney was not permitted to refer to other suspects. But Judge Anderson replied that the prosecutor's objection was based on a misunderstanding of the court's ruling:

THE COURT: [C]onsistent with what I said [at the time of the defense] opening statement, ... I don't deem a reference to the existence of other suspects to be inappropriate or in violation of the court's order. The only thing [covered by the order] is whether or not evidence could be offered as to a specific identified suspect or specific identified suspects.... [T]here's a foundational requirement that ... needs to be met [before such evidence can be introduced]. [But] that's been the only extent of the ruling. And I don't deem [it]

a violation [for the defense attorney] to refer to whether or not [the officer] tapes suspects. I think it's clear in context that ... this is the kind of case where there [was] more than one possible suspect at various points along the way.

The State's next witness was the lead investigator in the case, State Trooper Sgt. James McCann. During his cross-examination of Sgt. McCann, Smithart's attorney openly attacked DeForest's credibility and suggested that DeForest had not been truthful in describing his own whereabouts and activities on the day of the abduction/murder. During cross-examination, McCann conceded that DeForest never mentioned the fact that there were two versions of his time sheets. McCann also conceded that DeForest had never previously told the troopers about two teenagers who DeForest now claimed could verify his whereabouts on the afternoon of the crime. Finally, McCann admitted that the troopers had never investigated DeForest's alibi until the time of Smithart's trial. Based on these answers, Smithart's attorney suggested that DeForest had not been forthright with the troopers. The defense attorney pointedly asked McCann if it wouldn't have been prudent to investigate the man who was pointing the finger at Smithart.

Smithart's trial lasted another eight days after Sgt. McCann's testimony. On July 13th–15th, Smithart presented his case. Smithart's main witnesses were his alibi witnesses and his metallurgy expert. At the conclusion of the defense case, the prosecution presented one rebuttal witness (the owner of the Copper River Cash Store, who testified about the cash register tape that cast doubt on Smithart's alibi). The evidence then closed.

Throughout the presentation of evidence at Smithart's trial, Judge Anderson never once invoked *Marrone* to limit Smithart's presentation of evidence or cross-examination of witnesses. Smithart's attorney conducted extensive cross-examinations of DeForest and of the two state trooper investigators, Churchill and McCann. In these cross-examinations, Smithart's attorney plainly suggested that DeForest had invented a story about seeing Smithart's vehicle on Tazlina

Terrace Drive, that DeForest was lying about his own whereabouts on the afternoon of the crime, and that DeForest was himself a prime suspect. As described above, the prosecutor raised only one *Marrone* objection to this cross-examination, and Judge Anderson overruled it.

We also note that, during the defense case, Smithart presented the testimony of a local resident, Randy Anderson, who told the jury that, at one point in the investigation, he himself had been a suspect in the abduction/murder. Anderson added that "a whole lot of other people" had also been suspected. There was no objection to this testimony.

On appeal, Smithart asserts that the evidence presented at his trial was sufficient to directly connect DeForest to the abduction and murder of M.L., thus meeting *Marrone*'s foundational requirement and thus obliging Judge Anderson to allow Smithart to introduce independent evidence of DeForest's guilt. We agree that, by the end of the trial, there was significant evidence suggesting that DeForest could be considered a suspect in the crimes. However, it must be remembered that Judge Anderson's initial *Marrone* ruling was based on Smithart's offer of proof at the beginning of trial (before the evidence opened). Judge Anderson explicitly invited Smithart's attorney to seek reconsideration of the *Marrone* ruling if, during the trial, the defense attorney felt that there was sufficient evidence to meet *Marrone*'s foundational requirement (evidence tending to directly connect DeForest to the crime). Despite this invitation, Smithart's attorney never sought reconsideration of the *Marrone* ruling. Further, Smithart's attorney never indicated that he had additional evidence that would be admissible once the *Marrone* threshold showing was met.

In short, when Smithart's attorney rose to deliver his summation to the jury on July 20th, *Marrone* had never been invoked to limit defense cross-examination of prosecution witnesses, and it had been invoked only once (at the very beginning of trial) to exclude proffered defense evidence—specifical-

ly, evidence that DeForest's workshop floor was painted orange, and that DeForest had been accused of having consensual sex with a fifteen-year-old girl. Having reviewed the record, we conclude that Judge Anderson was justified in excluding these two pieces of evidence, independently of the *Marrone* rule.

■ Regarding the orange paint, the defense attorney suggested that this evidence was relevant because DeForest's workshop was a possible source of paint chips similar to the ones found on M.L.'s clothing. However, when questioned by Judge Anderson, the defense attorney conceded that he had not sought forensic testing of the paint from DeForest's shop, so he had no way of knowing if that paint matched the evidence found on M.L.'s clothing, or if the paint on DeForest's shop floor was any more similar to the evidence found on M.L.'s clothing than the paint that might be found in any other shop in the Copper Center area. Under these circumstances, Judge Anderson could properly reject the offered evidence for lack of relevance.[7]

■ Regarding Smithart's allegation that DeForest had engaged in consensual sex with a 15–year–old girl, Smithart offered to prove that the girl's parents had accused DeForest of having sex with their daughter, and that this accusation was corroborated by an entry in the girl's diary. In response, the prosecutor told the court that the sexual abuse allegation had, in fact, been reported to the authorities, but the resulting investigation did not lead to criminal charges because the allegation was found to be untrue. Smithart did not respond to the prosecutor's assertion. Under these circumstances, Judge Anderson again could conclude that Smithart's offered evidence (an untrue allegation of sexual misconduct) was irrelevant.

■ Moreover, even assuming that Smithart's silence did not constitute an abandonment of his request to introduce this evidence, Judge Anderson was still justified in rejecting this evidence. Smithart's purpose in offering evidence that DeForest may have

---

**7.** Smithart's request to introduce evidence of the orange paint was made at the very beginning of the trial (prior to opening statements). Smithart

never renewed his request to introduce this paint evidence, nor did he ever supplement his offer of proof.

engaged in consensual sex with a 15–year–old girl was (1) to suggest that DeForest had a propensity to engage in sex with minors, and (2) to further suggest that any person who engages in consensual sex with minors is more likely to engage in the kidnapping, rape, and murder of minors. This is the type of character evidence that is declared inadmissible by Evidence Rule 404(b)(1)—evidence of a general trait of character, introduced to prove that the person acted in conformity with that trait. *Jordan v. State*, 895 P.2d 994, 999 (Alaska App.1995).

 Nor would DeForest's alleged prior act of consensual sexual intercourse with a minor qualify for admission under Evidence Rule 404(b)(2). Rule 404(b)(2) requires a foundational showing that the prior act was "not too remote in time", was "similar to the offense charged", and was "committed upon persons similar to the [victim]". Smithart never specified when DeForest had allegedly engaged in sexual activity with the 15–year–old girl. Further, the only asserted similarity between the 15–year–old girl and 11–year–old M.L. was that both were underage females. Most importantly, Smithart failed to explain how DeForest's alleged act of consensual intercourse was "similar" to the abduction, sexual assault, and murder inflicted on M.L.

For these reasons, Judge Anderson could justifiably conclude—completely apart from the *Marrone* rule—that even if Smithart had solid evidence tending to show that DeForest had engaged in an act of consensual intercourse with a 15–year–old girl, this evidence would not be admissible to prove that DeForest had committed the crimes charged against Smithart.[8]

In sum, Smithart has failed to show that his cross-examination of witnesses and presentation of evidence was affected by Judge Anderson's *Marrone* ruling. With two exceptions, Judge Anderson never invoked the *Marrone* rule to limit Smithart's crossexamination or presentation of evidence. And with

---

8. Smithart's attorney did in fact make a later request to cross-examine DeForest about his alleged sexual liaison with a 15–year–old girl, and to introduce extrinsic evidence of this liaison if DeForest denied it. This request occurred during a break in DeForest's testimony. Smithart's attorney asserted that the girl in question was now prepared to testify that the sexual activity had occurred.

However, Smithart's attorney did not argue that this evidence was relevant to establish DeForest's propensity to sexually abuse children. Instead, the defense attorney argued that this evidence was relevant to rebut DeForest's assertion (during direct examination) that he coached wrestling at the local school because he wanted to help children enjoy a better upbringing than the one he had received.

Smithart's announced purpose was to cross-examine DeForest on a completely collateral issue—his reason for coaching school sports. If DeForest had denied engaging in sex with the girl, the rules of evidence would have barred Smithart from introducing the girl's testimony to impeach DeForest on this collateral issue. *See Shane v. Rhines*, 672 P.2d 895, 898 n. 2 (Alaska 1983) ("evidence which is offered to contradict a collateral matter is inadmissible"); *Morrell v. State*, 575 P.2d 1200, 1204 (Alaska 1978) (extrinsic impeachment of a witness concerning a collateral matter is not allowed).

Moreover, Judge Anderson could properly deny even Smithart's request to cross-examine DeForest regarding the reasons for his decision to coach high school wrestling. The judge could justifiably infer that, regardless of the defense

attorney's purpose in seeking this cross-examination, the primary effect of the cross-examination would be to suggest to the jury that DeForest was sexually interested in teenagers. As we have already discussed, Judge Anderson could properly conclude that DeForest's willingness to engage in consensual sex with a 15–year–old was not particularly relevant to the issue of whether DeForest was likely to sexually assault and kill an 11–year–old, and would in any case be inadmissible for that purpose.

We further note that the jury heard evidence that DeForest had married a 17–year–old girl who was pregnant (by him) at the time of the marriage. Thus, the jury understood that DeForest was sexually attracted to at least one teenager. For these reasons, we conclude that Judge Anderson's ruling on this proposed cross-examination (and proposed presentation of the girl's testimony) was not an abuse of discretion.

In Smithart's brief to this court, he argues that the proposed cross-examination of DeForest (and presentation of the girl's testimony) was relevant to establish that DeForest "had a reason to curry favor with the prosecution"—*i.e.*, to avoid prosecution for sexual abuse of a minor. Smithart did not make this argument to the trial judge; he therefore is not entitled to make this argument on appeal. *Jones v. State*, 576 P.2d 997, 1000–1001 (Alaska 1978); *Dyer v. State*, 666 P.2d 438, 450–451 (Alaska App.1983) (when a defendant offers evidence for one purpose at trial and the trial judge excludes the evidence, the defendant may not argue a different theory of admissibility on appeal).

respect to the two instances in which Judge Anderson did limit Smithart, the limitations imposed by the judge were justifiable without regard to *Marrone*.

### (d) The close of trial, the ruling concerning the scope of argument, and Smithart's summation to the jury

*Marrone* came up one more time after the close of the evidence. The parties argued jury instructions and other procedural matters on July 16th and 19th. During the discussion of jury instructions, Smithart's attorney alerted the court that he intended to present an instruction on the existence of other potential suspects. In response, the prosecutor asserted that the court's *Marrone* ruling prevented the defense from identifying specific other suspects by name. This prompted Judge Anderson to again address the scope of his *Marrone* ruling:

> THE COURT: I guess I need to make one thing fairly clear to the State.... [M]y prior ruling ... doesn't preclude any argument about other suspects. And, indeed, ... as for those who have testified, ... the defense can make arguments about them from a bias standpoint, too, ... which may well [amount to] the same thing....
>
> The only thing that I intended to deny, and the only thing that I did deny ... is the presentation of specific evidence tending to point the finger at ... another suspect unless that [evidence] tended to connect [that] person ... with the crime in some way beyond motives that would extend to the world at large.

Judge Anderson's statement to the parties could be read as a clarification and correction of the error in his initial *Marrone* ruling. Judge Anderson's words appear to clarify that he interpreted the *Marrone* rule to restrict only the introduction of a particular type of evidence at trial (extrinsic evidence offered to prove that a third party committed the crime). Judge Anderson's words also appear to clarify that Smithart remained free to argue (based on any evidence that had been presented at trial) that specific other people might have committed the crime.

However, the record also suggests that this clarification was lost on the parties. A few minutes after Judge Anderson made the above-quoted remarks, during the discussion of a defense-proposed jury instruction, Smithart's attorney remarked in passing, "You [Judge Anderson] said [that] I ... can't refer to a particular person who may have done it, but [I am permitted to point out] that there was a world of other suspects out there." Judge Anderson responded as follows:

> THE COURT: I'm certainly not prohibiting the defense from arguing that there are other possible suspects. And I'm certainly not prohibiting [the defense] from arguing [any evidence] that may relate to persons who have testified—because [a person's status as a possible suspect] can amount to a bias argument[.]

This response was unfortunately ambiguous; Judge Anderson did not clearly inform the defense attorney that he was free to single out DeForest as an alternative perpetrator. And indeed, in his ensuing summation, the defense attorney refrained from expressly arguing that DeForest was the real perpetrator of the crime.

Nevertheless, despite the defense attorney's apparent confusion regarding the permissible scope of final argument, the defense attorney devoted a large portion of his summation to David DeForest and DeForest's possible links to the crime. Soon after he began his summation, the defense attorney announced that he was going to "talk about Dave DeForest for a while":

> DEFENSE ATTORNEY: Charlie Smithart is on trial. But maybe other people should be on trial instead of Charlie Smithart, because there are other viable suspects in this case[.]
>
> . . .
>
> [If there are] inconsistencies and contradictions in [a witness's] testimony, [or] between their testimony and others', their recollection may be unreliable, or the witness is being untruthful. And that's where Dave DeForest comes into play. Let's talk about Dave DeForest for a while.

Smithart's attorney told the jury that DeForest was a thief and a liar; "[w]hen it benefits Dave DeForest, he'll lie." The de-

fense attorney noted that DeForest had concededly lied on the stand at Smithart's trial when he denied owning handguns. And the defense attorney urged the jury not to believe DeForest's claim that he had no interest in the $20,000 reward offered for the identification of M.L.'s murderer.

The defense attorney argued that DeForest had given several conflicting accounts of his activities on August 22nd, and that DeForest had no verifiable alibi for the afternoon of the crime. The attorney reminded the jury that DeForest had never told the troopers about the long form of his time sheets, or about the teenagers who might have corroborated his whereabouts on the day of the crime, until the time of Smithart's trial. Further, the defense attorney asserted, DeForest's explanation of the discrepancies between his "short form" and "long form" time sheets was incredible. The defense attorney noted that DeForest had admitted signing the short form time sheet only after the troopers asked to see it, so that it would look official. Based on all this evidence, Smithart's attorney argued that the times recorded on DeForest's time sheets were simply not credible:

> The dates and times are different because Dave DeForest went back and filled in the times, ... filled [them] in after someone else called the police [with information that DeForest had himself been on Tazlina Terrace Drive], [filled them in] for the 20 days [during which] Dave DeForest failed to do anything at all.

The defense attorney also pointed out that, for two and a half weeks following the abduction, DeForest failed to mention seeing Smithart (or anyone else) in the Tazlina Terrace Drive area, and he asserted that DeForest had no good explanation for why he delayed informing the authorities of this crucial information. He noted that, even though DeForest said that he called the police on August 30th or 31st, there was no record of such a call. Moreover, the defense attorney argued, DeForest had given inconsistent accounts of when he purportedly saw Smithart's vehicle in the area.

Based on this evidence, Smithart's attorney suggested that "Dave DeForest was just lying.... [W]e know Dave DeForest didn't see Charlie Smithart on the 22nd because of all the other things he says."

Smithart's attorney also suggested that DeForest was a plausible suspect because his activities on August 22, 1991, had put him in contact with metal shavings and paint like the ones found on M.L.'s body:

> What do we know [about what] Dave DeForest was doing on [August] 22nd? We know [that] Dave DeForest was working on a truck. He was grinding that day. He had grease all over him. He works in a shop that has paint. He works in a shop where they do welding.... And that becomes very important in this case, ... because Dave DeForest was trying to be oh-so-careful about [declaring,] "I didn't grind paint that day, and, well, I was grinding that day, just not paint, and I hired these kids [to do the job] because I didn't want to get my hair dirty, and I didn't want to get grease all over my hair, but I had been scraping grease off the truck that day."

The defense attorney argued that the paint and metal shaving evidence might link DeForest to the crime just as much as Smithart. He asserted that even the prosecution's expert witnesses conceded that the metal shavings on M.L.'s body might not match the ones taken from Smithart's workshop. He then attacked the prosecution's position that any discrepancies were not significant:

> Charlie [Smithart's workshop] had brass and had iron oxide, and he had paint that was small, and he had fibers we can't say from [what] source. So [M.L.] had contact with someone who had those things; okay. Well, who else could [it] have [been]?
>
> [T]here were other people out there. Dave DeForest—he was grinding, they weld at his shop, they paint; the truck's red, he's working on a white truck with blue. He ... says he wasn't painting on it then, [but] who knows? Who knows what would have been found in Dave DeForest's shop if they could have gone in there and looked in Dave DeForest's shop? We don't know, but we know that David DeForest was doing those things, and [he]

was in the area that day, too. But let's blame Charlie Smithart because these [materials] were in his life. We'll never check Dave DeForest's life and see what's in Dave DeForest's life.

Based on these portions of the defense summation, we conclude that the error in Judge Anderson's *Marrone* ruling did not prejudice Smithart's ability to argue his case. We reiterate that the *Marrone* rule does not affect a defendant's ability to argue any and all inferences that can be reasonably drawn from the evidence. Thus, Judge Anderson was wrong when, at the outset of the trial, he indicated to Smithart's attorney that *Marrone* prohibited the defense from directly accusing DeForest (or any other third person). Moreover, Judge Anderson's subsequent efforts to clarify his ruling were seemingly ineffective; until the end of trial, and through his summation to the jury, Smithart's attorney apparently continued to believe that he could not directly accuse David DeForest of committing the crime.

However, even with this limitation, the defense summation clearly communicated to the jury that DeForest was a likely suspect, and the defense attorney discussed all of the reasons for believing that DeForest might have committed the crime. In other words, the defense attorney was able to effectively present and argue his theory that DeForest was a plausible alternative suspect—and that this possibility (that DeForest had committed the crime) should lead the jury to have a reasonable doubt concerning Smithart's guilt.

■ Thus, even though the defense attorney believed himself constrained from singling out DeForest as the perpetrator of the crime, we find it extremely unlikely that this perceived limitation on the defense summation had any impact on the jury's consideration of the case. Our conclusion is fortified by the strength of the State's evidence against Smithart, as well as the collapse of Smithart's alibi during the State's rebuttal case. Viewing the record as a whole, we conclude that the erroneous portion of Judge Anderson's *Marrone* ruling was harmless beyond a reasonable doubt.

*Conclusion*

The judgement of the superior court is AFFIRMED.

COATS, J., dissenting.

COATS, Judge, dissenting.

I agree with the majority that Judge Anderson erred when he prohibited Smithart from arguing that David DeForest committed the crime. However, in my judgment, this error was more of a handicap to Smithart's defense than the majority perceives it to be.

At the outset of the trial Smithart indicated that he wanted to organize his defense around the theme that David DeForest committed the crime. In an offer of proof Smithart's attorney set out a circumstantial case against DeForest. DeForest was a key prosecution witness who placed Smithart at the scene of M.L.'s abduction. Therefore, by his own testimony, DeForest was present at the scene and placed himself in a position to have committed the crime. Smithart's attorney pointed out that DeForest did not report seeing Smithart at the scene of the abduction until nearly three weeks after M.L. disappeared. He argued that DeForest had made several inconsistent statements about seeing Smithart on Tazlina Drive. He contended that DeForest had made inconsistent statements about his activities the afternoon M.L. was abducted. He claimed that DeForest's inconsistent statements suggested that he had fabricated the report. DeForest had previously been convicted of attempted burglary, a crime of dishonesty. Because of this conviction he was prohibited from possessing weapons. DeForest originally denied possessing any weapons to police investigators. However, he ultimately admitted to possessing weapons in violation of the law, including a .22 caliber weapon which was the type of weapon the police believed had been used to kill M.L. DeForest worked in a shop which could have yielded the paint chips and metal particles which were found on M.L.'s clothing. Smithart's attorney argued that the circumstantial case against DeForest was sufficient to allow him to argue to the jury that the evidence suggested DeForest committed the crime, or at least that the circum-

stantial case against DeForest was sufficiently strong to create a reasonable doubt that Smithart committed the crime.

By taking this position at the outset of the case, Smithart's attorney took a big risk. If the prosecution could convince the jury that DeForest could not have committed the crime, Smithart's case would suffer a serious blow. However, if Smithart could convince the jury that there was a reasonable chance that DeForest committed the crime, he could establish a reasonable doubt of Smithart's guilt. We all agree that Smithart was entitled to an opportunity to argue this theory of the case to the jury. Although I concede that it is a close question, I don't believe that Smithart's attorney can be faulted for not pressing Judge Anderson to modify or clarify his ruling. The attorney made a clear offer of proof at the start of the trial setting out his proposed strategy. Judge Anderson refused to let him follow that strategy. During the trial Smithart's attorney did not present any evidence which significantly differed from his offer of proof. It does not seem unreasonable to me for the attorney to assume that Judge Anderson would stand by his original ruling. As a result, the attorney was prevented from arguing to the jury his theory of the case that there was a reasonable doubt concerning Smithart's guilt because there was similar circumstantial evidence to support the conclusion that David DeForest had committed the crime, and that DeForest had testified against Smithart to deflect suspicion.

It is true that Smithart was able to introduce much of the evidence which supported his theory that DeForest was an alternative suspect. However, because Smithart was unable to argue this theory to the jury and rest his case on it, his defense lacked any cohesion. He was unable to assemble the circumstantial evidence which suggested that DeForest could have committed the crime into an argument which might have made sense to the jury. In my view this was a serious handicap to the effective presentation of Smithart's defense.

Whether this handicap was rendered harmless because of the strong case against Smithart is also a close question. Although the physical evidence against Smithart was compelling, I am not convinced that it was sufficient to overcome the fact that Smithart was prevented from arguing his theory of the case to the jury. I therefore dissent from the court's decision affirming Smithart's conviction.